VICTOR M. FRANCOIS, Appellee

v.

A. JANE FRANCOIS, GEORGE H. ADAMS and WILLIAM H.
DICK, d/b/a AD'M ENTERPRISES, a Limited Partnership,
A. JANE FRANCOIS, Appellant

No. 78-2690

United States Court of Appeals

Third Circuit

Argued April 25, 1979

Filed June 11, 1979

133

JESSE M. BETHEL, ESQ. (LEHTONEN & COLEMAN), Charlotte Amalie, St. Thomas, V.I., *for appellant*

EDITH L. BORNN, ESQ., Charlotte Amalie, St. Thomas, V.I., *for appellee*

Before ROSENN, MARIS and HUNTER, *Circuit Judges*

OPINION OF THE COURT

ROSENN, *Circuit Judge*

We are asked in this appeal to assess whether the district court properly relieved a husband from the disastrous financial consequences of a "Property Settlement and Separation Agreement" (agreement) entered into with his wife. The plaintiff, Victor H. Francois, instituted an action in the district court against his wife, A. Jane Francois, seeking rescission of the agreement and various real and personal property transfers made pursuant to that agreement. The district court declared the agreement and the conveyances to be null and void on the grounds, inter alia, that Jane Francois had exerted undue influence over her husband. The district court restored title to one parcel of

real property and various securities to Victor Francois in his name alone. From the final order of the district court, Jane Francois appeals alleging that the district court improperly invalidated the agreement and reconveyed properties to her husband. We affirm.

## I.

The controversy before us arises out of the troubled and relatively brief marriage of the parties. Victor H. Francois (Victor) and A. Jane Francois (Jane) were married on May 13, 1971 after a brief courtship of several months. At the time of the wedding, Victor was fifty years old, a bachelor residing with his elderly mother. Jane was thirty years old, twice divorced and the mother of two minor children, one approximately sixteen years old, and the other, thirteen. Victor was relatively secure financially, possessing an acre lot, Lilliendal and Marienhoj, St. Thomas, V.I. (Lilliendal), with a two story, five bedroom building containing two apartments, a one-fourth interest in his family's hardware business, thirty shares of a family close corporation (Francois Realty), four shares of stock in a multi-family close corporation (21 Queen's Quarter), a portfolio of publicly held stock valued at between $18,000 and $19,000, and two bank accounts. Victor also received income from his job as manager of the family hardware business. Jane was gainfully employed at the time of the marriage but ceased working shortly thereafter. She apparently brought no money or property to the marriage.

The couple began to experience difficulties not long after the marriage. A series of events over the next four years centering on financial disputes led to the deterioration and eventual collapse of the marital relation. Within months of the wedding, Jane began to express anxiety over her financial security in the event that Victor died. To allay

his wife's fears, Victor opened a joint savings account into which he deposited $5,000 for her use.

Jane also expressed a continuing desire for a marital homestead. In response, in March of 1972, Victor purchased a fairly large house with swimming pool (Misgunst) for a sum of $107,000. Victor supplied a $37,000 downpayment from his assets and undertook the responsibility for the monthly mortgage payments in excess of $860 per month. Title was taken by the entireties. The same year, Victor filed a petition seeking adoption of Jane's two children. The court granted the petition after Victor acknowledged under oath that he voluntarily assumed responsibility for the children.

In the fall of 1973, the couple's finances became further consolidated. Victor conveyed all of his interest in his Lilliendal property to Jane and assigned to her a half interest in both his thirty shares of Francois Realty stock and four shares of 21 Queen's Quarter stock. He also gave Jane a power of attorney over his portfolio of publicly held stock. Jane also insisted on having a boat. Victor sold $18,000 of his stock in order to purchase a boat for Jane in her name at the cost of $17,000. Jane sold this boat approximately a year later for $16,000 and personally invested the proceeds for herself. The couple also executed reciprocal wills leaving the entirety of the marital estate to the surviving spouse or, if no spouse survived, to the children.

In September of 1974 a domestic quarrel precipitated the demise of the marriage. The dispute centered on an incident in which Victor allegedly embarrassed Jane by his behavior in front of one of Jane's friends. As a result of the incident, Jane determined to divorce Victor and on October 8, 1974, contacted an attorney, Harold Monoson, to draw up divorce papers. Victor was unaware of his wife's decision to terminate the marriage. Two days later,

Jane, without any explanation, invited Victor to accompany her to Monoson's office where Victor, to his complete surprise, was presented for his signature a "Property Settlement and Separation Agreement." Monoson advised Victor that he would need an attorney, but Victor's choice was vetoed by his wife's insistence that this attorney was unacceptable. Monoson then asked a lawyer with an office in the same building, Gregory Ball, to come into the office. Ball read the agreement, which interestingly already had his name on it as Victor's counsel. Ball strenuously advised Victor not to sign the agreement because it would commit him to "financial suicide". When Victor persisted in his determination to sign, Ball informed him that he could not represent him in the matter, and left the office.

Victor, relying on representations made to him by Monoson and Jane, was persuaded that only by signing the agreement could he preserve his marriage. Victor signed the agreement and several related documents apparently in hope of saving his marriage. He conveyed to Jane his one-half interest in the marital home, Misgunst, and assigned to her his stock portfolio and his remaining stock interest in both close corporations. In addition, the agreement required Victor to pay $300 per month in alimony to his wife.

After signing the agreement, however, the parties resumed cohabitation for approximately one year. But early in 1975, Jane informed Victor that she had sold the entire portfolio of publicly held stock for around $20,000. In October of 1975, Jane informed Victor that she had sold the Misgunst and Lilliendal properties in exchange for properties owned in California by AD'M Enterprises, a limited partnership. In mid-October Jane also summarily informed Victor that she was leaving him permanently and promptly left the Virgin Islands. AD'M took title to the properties by a single deed dated October 15, 1975 but

before it could record the deed, Victor instituted these proceedings. Apparently when AD'M learned of this litigation, it never recorded the deed but instead sued Jane for rescission of the conveyance.

Victor's suit against Jane and AD'M sought rescission of the agreement and reconveyance of all properties transferred to Jane. AD'M was duly served but never appeared and a default judgment was entered against them from which no appeal has been taken. The case was tried to the court without a jury.

Chief Judge Christian, the trial judge, declared the Property Settlement and Separation Agreement to be null and void as the result of: 1) the cohabitation of the parties subsequent to the signing of the agreement; 2) the undue influence exerted by Jane over Victor in connection with the signing of the agreement; 3) fraud and misrepresentation on the part of Jane; and 4) the unconscionable terms of the agreement. Judge Christian also declared the deed of October 10, 1974 transferring sole title in the Misgunst property to Jane to be null and void and awarded title to the property solely in Victor's name. The court held the attempted transfer of Misgunst and Lilliendal properties by Jane to AD'M to be null and void. The court likewise voided the assignment made to Jane, pursuant to the agreement, of Victor's stock in the two close corporations, Francois Realty and 21 Queen's Quarters, and restored sole title to the stock to Victor. The court decreed that title to the Lilliendal property remain in Jane's name because "the circumstances of that transfer were not explicated before the court in the testimony." The court, however, placed a lien against the Lilliendal property to secure Victor's reimbursement for the value of the stock and monies converted by Jane in early 1975. Finally, the district court awarded costs and attorneys fees to Victor.

## II.

Jane's first contention on appeal is that the district court erred in setting aside the Property Settlement and Separation Agreement. She challenges each of the four theories underpinning the district court's order of nullification. Because we agree that the district court properly voided the agreement on the grounds of undue influence exerted by Jane over her husband, we need not examine Jane's contentions relating to the three other theories supporting the district court's judgment.

We turn then to the issue of undue influence. The district court found that a confidential relationship existed between Jane and Victor. The court further found that Jane was the dominant partner in the marriage and that Victor was extremely susceptible to her influence. The court noted that the evidence was replete with instances in which Jane was able to secure her wishes by simply badgering Victor into submission. The court held that because a confidential relationship existed between the parties, the burden of proof was on Jane to demonstrate the fairness of the agreement. The court found that Jane deliberately misrepresented and misled Victor into believing that his signature on the agreement could save their marriage. The court concluded that Jane had failed to establish the fairness of the transaction and declared the agreement to be null and void.

Jane argues that the district court erred in placing the burden of proof on her to demonstrate the fairness of the transaction. She contends that a husband-wife relationship does not necessarily give rise to a relation of confidence. Even if such a confidential relationship existed, Jane maintains that the burden of proof is on the person seeking to void the transaction to show undue influence. She asserts that because Restatement law is authoritative in the Vir-

gin Islands,[1] Restatement of Contracts § 497 on undue influence,[2] read in conjunction with Restatement § 498 on fiduciary relations[3] mandates the conclusion that only in fiduciary relationships does the burden of proof shift to the party benefiting from the transaction to prove its fairness. Jane concludes that because husbands and wives do not stand in a fiduciary relation to each other, the burden of proof rested on Victor to prove the unfairness of the Property Settlement and Separation Agreement. Appellant's interpretation of the Restatement, however, is erroneous and misconstrues the law of undue influence.

 We believe that this case is controlled by the law of constructive trusts although neither side briefed or argued it on this theory. A constructive trust is an equitable remedy utilized by courts to prevent unjust enrichment. Restatement of Restitution § 160; Scott on Trusts, § 462. It is an established principle of equity that "[w]here the owner of property transfers it, being induced by fraud, duress or undue influence of the transferee, the transferee holds the property upon a constructive trust for the transferor." Restatement of Restitution § 166. See also, Yohe v. Yohe, 353 A.2d 417, 421 (Pa. 1976). A common context in which undue influence may be exerted so as to warrant the imposition of a constructive trust is when a party to a

---

[1] 1 V.I.C. § 4 (1967) reads: "The rules of the common law as expressed in the restatements . . . shall be the rules of decision in the courts of the Virgin Islands . . . in the absence of local laws to the contrary."

[2] Restatement of Contracts § 497 (1932) reads: "Where one party is under the domination of another, or by virtue of the relation between them is justified in assuming that the other party will not act in a matter inconsistent with his welfare, a transaction induced by unfair persuasion of the latter, is induced by undue influence and is voidable."

[3] Id. § 498 reads:
Where a beneficiary enters into a transaction with his fiduciary relating to matters within the scope of the fiduciary relation, the transaction is voidable, unless
(a) it is fair and reasonable, and
(b) is assented to by all parties beneficially interested, with knowledge of their legal rights and of all relevant facts that the fiduciary knows or should know, and
(c) these parties are of competent age and understanding and are not subject to undue influence.

confidential relationship abuses that relation to secure personal advantages. See Scott, § 469 at 3441; Stauffer v. Stauffer, 351 A.2d 236, 241–42 (Pa. 1976); Buchanan v. Brentwood Federal Savings and Loan Ass'n, 320 A.2d 117, 127 (Pa. 1974). A confidential relationship may arise as a matter of law; but it is usually a question of fact in each case. Buchanan supra at 127.

> A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation may exist although there is no fiduciary relationship; it is particularly likely to exist where there is a family relationship . . . .

Restatement (Second) of Trusts § 2, at 7 (1959). See also, Restatement of Restitution § 166, Comment (d) at 676–77 (1937); Restatement of Contracts § 497, Comment (a), at 954–55 (1932).

■ The key inquiry in the case before us is whether Jane and Victor Francois, as husband and wife, also enjoyed a confidential relationship. The marital relation does not automatically give rise to a confidential relation, but it "arises when one party places confidence in the other with a resulting superiority and influence on the other side." Yohe supra at 421. Thus, each marriage must be examined on its own facts to determine if a confidential relation exists.

■ The district court unequivocally found that a confidential relationship existed between Jane and Victor Francois and that Jane was clearly the dominant partner. The district court found the evidence to be "replete with instances" in which Jane was able to secure her wishes simply by badgering Victor into submission. The record reveals that Victor, very early in the marriage, began to turn over the management of his finances to Jane who subsequently used her position to gain control incrementally over most of Victor's assets. The evidence supports the

141

district court's findings that the relationship between the parties was one in which Victor reposed total trust and confidence in Jane who used her superior position in the marriage to Victor's financial detriment.

■■ The existence of a confidential relationship does not automatically give rise to the imposition of a constructive trust. Rather, "its effect is simply to impose a burden upon the party benefiting from the transaction of proving that he took no unfair advantage of his relationship with the other." Stauffer, supra at 242. Williston states that if the person alleging undue influence can prove that "he was the servient member of a confidential relationship, . . . [c]ourts hold that this raises a rebuttable presumption of undue influence requiring the dominant party to come forward with proof of the fairness of the transaction." Williston on Contracts, § 1625 at 800 (3d ed. 1970) (footnotes omitted). We also have held in Joseph v. Eastman,[4] 5 V.I. 201, 207, 344 F.2d 9, 12 (3d Cir. 1965), that in relationships of trust or confidence the burden of proof shifts to the person seeking to uphold the transaction to demonstrate the absence of undue influence. Thus, Jane's contention that the trial court incorrectly shifted the burden of proof to her to show the lack of undue influence is meritless. The trial court, after determining the existence of a confidential relation quite properly allocated the burden of proof to Jane.

We must now consider whether Jane met her burden of proof to rebut the charge of undue influence. If she failed, a constructive trust may be imposed on the couple's properties in order to prevent Jane's unjust enrichment.

---

[4] Appellant tries to distinguish this case on its facts. Brief at 24, n.14. Appellant argues that Joseph involved a fiduciary relationship because the court used the term "trust and confidence" to describe the relationship. We think that the case is best viewed as consistent with a shift in the burden of proof whenever a confidential relationship exists between the parties.

 Undue influence is not a concept susceptible of unitary definition. The essence of the idea is the subversion of another person's free will in order to obtain assent to an agreement.

If a party in whom another reposes confidence misuses that confidence to gain his own advantage while the other has been made to feel that the party in question will not act against his welfare, the transaction is the result of undue influence. The influence must be such that the victim acts in a way contrary to his own best interest and thus in a fashion in which he would not have operated but for the undue influence. Williston on Contracts, § 1625 at 776–77 (3d ed. 1970) (footnotes omitted).

The degree of persuasion that is necessary to constitute undue influence varies from case to case. The proper inquiry is not just whether persuasion induced the transaction but whether the result was produced by the domination of the will of the victim by the person exerting undue influence. Restatement of Contracts § 497, Comment c. Hence, the particular transaction must be scrutinized to determine if the agreement was truly the product of a free and independent mind. In this respect, the fairness of the agreement must be shown by clear and convincing evidence. Id. 1627B at 823, Buchanan supra at 127.

 Jane claims that the factual findings of the court distorted the true relationship between the parties and that no undue influence was present. First, we note that the district court's fact-finding cannot be disturbed unless it "(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supporting evidentiary data." Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir. 1972). We believe that the evidence in this case amply supports the district court's finding of undue influence.

The district court found that Jane alone caused the agreement to be made and that she alone benefited from

143

it. The district court described the circumstances under which Victor was urged to obtain legal advice as a charade. There is no evidence that the independent advice received by Victor was from an attorney of his choosing. In fact, the meeting with Attorney Ball was arranged spontaneously and without an opportunity for a full and private consultation. Ball's name was already on the agreement as Victor's counsel. (For importance of independent counseling, see Williston, supra § 1625 at 778.) Victor was apparently surprised by his wife's decision to terminate the marriage and there is evidence that Monoson and/or Jane misled him into believing that by signing the agreement, the marriage could be salvaged. The district court also found that Jane, at the time the agreement was signed, had no real intent to save the marriage.

The terms of the agreement were hardly fair. Attorney Ball's assessment that the agreement was financial suicide for Victor was accurate. On this record, we conclude that the district court was correct in its finding that Jane had failed to rebut the presumption of undue influence.

We thus have a classic situation in which a constructive trust should be imposed over all the assets acquired by Jane. The district court properly used its equitable power to declare the agreement to be null and void. Equity should fully protect one spouse from exploitation through the exercise of undue influence by the other in whom confidence and trust has been innocently reposed.

## III.

Having concluded that the district court properly voided the Property Settlement and Separation Agreement, we must now consider whether the district court's dispositions of the specific properties transferred were correct. The district court nullified the transfers made along with the

agreement itself and awarded the properties solely to Victor.

The district court voided the transfer of sole title in the Misgunst property to Jane and Jane's subsequent transfer to AD'M Enterprises.[5] The court then reconveyed Misgunst, held prior to the voided agreement as a tenancy by the entirety, to Victor alone. Jane contends that this action was error on the part of the district court in several respects.

 She argues initially that Victor never sought an award of sole title to Misgunst in his prayer for relief. Although the amended complaint seeks reconveyance of Victor's "interest" in Misgunst, this interest might logically be construed as a half-interest given the presence of the tenancy by the entirety. The amended complaint, however, also prays for "such other and further relief" as the court deems just and proper. Under Fed. R. Civ. P. 54(c) "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." It has been held that the plaintiff is not strictly bound by his prayer for relief and that "the trial court is obligated to enter judgment in favor of plaintiff for any appropriate relief mandated by the evidence at trial." Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc., 531 F.2d 910, 919 (8th Cir. 1976). See also, Bail v. Cunningham Bros. Inc., 452 F.2d 182, 188 (7th Cir. 1971). Thus, whether award of title to Misgunst to Victor alone was specifically pleaded is not conclusive if the evidence at trial supports such an

---

[5] Appellant raises an extended argument to the effect that the district court improperly nullified the transfer to AD'M Enterprises because AD'M was a bona fide purchaser possessing superior legal and equitable title to the Misgunst property. This argument is not well taken. AD'M failed to appear in the district court to defend its title to the property and a default judgment was entered against it, from which no appeal has been taken. We do not believe that appellant has standing to raise the issue of AD'M's title to the property on appeal, particularly because it too sought rescission of its purchase agreement with Jane.

award.[6] The district court was clearly convinced that an award of Misgunst to Victor was a fair and just result.

Jane also complains that the case was not tried on any theory that would support a return of Misgunst to Victor, that she was taken by surprise and not apprised of the necessity to introduce evidence at the trial regarding her claim to Misgunst. However, Victor in his amended complaint pleads that as a result of domestic differences between the parties, he suffered from emotional stress, strain and nervousness rendering him unable to judge wisely and prudently his economic or business life. Amended Complaint ¶4. The focus of the trial court was primarily on the undue influence exerted in connection with the signing of the agreement. The district court, however, noted that the evidence, except as to Lilliendal, showed that almost from the inception of the marriage, a pattern developed by which Jane incrementally gained control over all of Victor's assets.

The evidence in this case demonstrates that not only were the transfers made pursuant to the agreement voidable for undue influence, but that the very purchase of Misgunst was itself an abuse of the confidential relationship between the parties and a part of the pattern of undue influence exerted by Jane over her husband. It is evident

---

[6] Alternatively, we believe that the pleadings may be deemed amended under Fed. R. Civ. P. 15(b) to conform to the evidence addressed at trial. In Schultz v. Cally, 528 F.2d 470, 474 (3d Cir. 1975) we held:

> Under Fed. R. Civ. P. 15(b) [footnote omitted], however, a pleading may be amended to conform to the proof, and if an issue, though never actually pleaded, is tried by express or implied consent of the parties, the pleadings may be *deemed* amended to conform, even after judgment or on appeal.

We also held in Niedland v. United States, 338 F.2d 254 (3d Cir. 1964) that failure to plead an item of special damage was not fatal to its eventual award:

> [T]here is implied consent to litigate an issue if there is no objection to the introduction of evidence on the unpleaded issue, as long as the nonobjecting party was fairly apprised that the evidence went to the unpleaded issue.

Id. at 258 (footnote omitted).

We believe that on this record, Jane was sufficiently aware of the charges of undue influence in *all* of the transactions, including the conveyance to her and Victor by the entireties of Misgunst.

that soon after the parties married, Jane began her campaign to acquire all of Victor's assets. There is evidence that Misgunst was purchased at Jane's constant insistence and that the purchase was tainted by undue influence.

Jane contends next that the district court exceeded its authority in awarding sole title to Misgunst to Victor. Jane correctly notes that the authority to transfer real property in the Virgin Islands can only be conferred by statute. The legislature has authorized judicial division of real property only in divorce actions and in partitions of tenancies in common.[7] She concludes that because the present action is neither one for divorce nor for a partition of a tenancy in common, the district court lacked the power to reconvey Misgunst to Victor in his name alone.

 Although we agree that Jane has correctly cited Virgin Island law, we disagree that the district court lacked the power to reconvey Misgunst to Victor. Because we believe that the very purchase of Misgunst was an abuse of the confidential relationship between the parties, a constructive trust may be imposed on the Misgunst property. The Supreme Court of Pennsylvania in Butler v. Butler, 347 A.2d 477, 481 (1975) stated that a constructive trust will be imposed over a gift of entireties property when the transaction was procured through abuse of a confidential relationship and when unjust enrichment results thereby. We hold that the district court possessed the equitable power to award Misgunst to Victor alone in order to prevent Jane from becoming unjustly enriched. She clearly had no equitable claim to the property because Victor contributed all of the funds for the purchase of Misgunst, paying a substantial downpayment and assuming the responsibility for significant monthly mortgage payments. The district court also possessed the power under Fed. R.

[7] Todman v. Todman, 15 V.I. 518, 571 F.2d 149 (3d Cir. 1978), Dyndul v. Dyndul, 13 V.I. 376, 541 F.2d 132 (3d Cir. 1976).

147

Civ. P. 54(c) to award Misgunst as part of the final judgment inasmuch as Victor was entitled to its award on equitable grounds. The district court's disposition of Misgunst was proper and constitutes no reversible error.

The district court also nullified the assignment of Victor's remaining interest in his two close corporations to Jane and returned the stock to him in his name alone. Jane argues that the district court had no power to order this result because the stock, prior to her acquisition of sole title, was held in joint ownership form. Again, Jane misses the thrust of the equitable proceedings in the district court. Jane obtained a half-interest in the stock in the fall of 1973 at the height of her success in consolidating the finances of the couple. The record here supports the conclusion that not only was the eventual transfer of stock to Jane in her name alone infected with undue influence, but that the original assignment of a half-interest in the stock was procured by her abuse of confidence and undue influence. The reconveyance of the stock to Victor solely was therefore proper.

■■■ Jane also argues that the district court improperly placed a lien on the Lilliendal property retroactive to the lis pendens placed on that property at the commencement of the litigation. The district court ordered the placement of this lien as a means for Victor to secure reimbursement for the stock converted by Jane prior to her departure. The district court was merely exercising its equitable power to fashion an appropriate remedy to protect Victor for the loss of his stock and we perceive no error.

## IV.

We must lastly consider whether the district court's award of $6,500 in attorneys fees to the plaintiff was proper. Jane contends that the district court's attorney's fee award must be reversed because the court failed to explain its award in accordance with our holdings in Lee v.

Lee, 13 V.I. 351, 537 F.2d 762 (3d Cir. 1976) and Lindy Bros. Bldrs. Inc. of Phila. v. American R. & S. San Corp., 487 F.2d 161 (3d Cir. 1973). We disagree.

We start with the proposition that "[i]n awarding attorney's fees, the district judge is empowered to exercise his informed discretion, and any successful challenge to his determination must show that the judge abused that discretion." Lindy Bros. supra at 166 (footnote omitted); Tranberg v. Tranberg, 8 V.I. 479, 483, 456 F.2d 173, 175 (3d Cir. 1972). In the Lindy Bros. case, we set forth standards for trial courts to use in determining an attorney's fees award in order to guide attorneys and claimants and to provide a meaningful basis for appellate review. 487 F.2d at 166–67. Those factors were: (1) the time spent by the attorneys, (2) valuation of the services performed (3) the contingent nature of success (4) the quality of the attorney's work. Id. at 166–69. We reiterated the importance of these guidelines in Lee v. Lee, by stating that "[a] trial judge must explain the considerations that enter into his decision." 13 V.I. at 356, 537 F.2d at 765.

In the case before us, Victor, as the successful plaintiff, submitted an affidavit to the court claiming $12,000 in attorney's fees. The affidavit set forth the number of hours spent on his legal work, with a breakdown as to office time, trial time, preparation for trial, and "out of office" time. The normal categorical billing rate was set forth and the hourly rate upon which the calculation of the attorney's fees was based. The affidavit was submitted to the court after the trial judge orally rendered his findings and opinion on the merits of the case. The trial judge reduced the amount claimed by approximately one-half and awarded $6,500 in attorney's fees to Victor. However, counsel for appellee might have, but took no exception to the reduction in fee, and appellant offered no counter-affidavit or testimony in opposition to the affidavit.

Although it is clearly preferable for the trial court to provide a written explanation of how the attorney's fees award was determined, we do not believe that the lack thereof in this case constitutes reversible error. First, it is apparent that the trial judge did have an affidavit before him which, although it could have been more detailed, sufficiently satisfied the purpose of the standards set forth in Lindy Bros. The affidavit shows both the time spent and the method for evaluating that time. There was no contingent fee agreement and the third standard set forth in Lindy Bros. was therefore inapplicable. Moreover, although the case was complex, counsel made no additional claim because of the quality of the work and the excellent result obtained.

The attorney's fees award was quite reasonable and "was set by an experienced district judge, knowledgeable community." Tranberg v. Tranberg, supra at 483, 456 F.2d at 175. We fail to see how Jane was prejudiced by the lack of explanation of an attorney's fees award that was half the amount claimed under the attorney's prevailing hourly rate. Thus, although there was no formal explanation by the trial court of the reasoning behind the attorney's fees award, the hourly rate charged appears to be reasonable and no objection is made to the number of hours claimed. We perceive no abuse of discretion to warrant reversal of the award. In the interests of judicial economy we will not remand under the circumstances of this case for a written explanation of the award. In so doing, we again remind trial courts that a written explanation of the basis for an attorney's fees award is still the preferred practice in this circuit, and that we will not hesitate to reverse awards from which we cannot adequately determine whether the standards of Lindy Bros. have been met.

Appellant raises other contentions on appeal, all of which are without merit.[8] Accordingly the judgment of the district court will be affirmed. Costs taxed against appellant.

[8] Appellant contends that the district court erred in several evidentiary matters, and that the trial judge engaged in conduct prejudicial to her case.