# IN THE MATTTER OF THE ESTATE OF MARGARITA ZIRI SAVAIN, Deceased

Probate Nos. 86/92 & 117/92

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

August 28, 1998

DANIEL RETTEW, ESQ. and DEAN BARNES, ESQ.,[1] *Counsel for Petitioner Ruth Robson*

KWAME MOTILEWA, ESQ. and RICHARD FARRELLY, ESQ., *Counsel for Petitioner Ecedro Rabsatt*

DIASE, *Judge*

## MEMORANDUM OPINION

These matters involve the competing claims of the proponents of two wills. The court must decide the following issues regarding the execution and validity of these wills and ultimately, which one should be admitted to probate: 1) did the testatrix substantially comply with the request and publication requirements of Virgin Islands law when she and the witnesses signed the wills; 2) was the testatrix of sound mind when she executed the later will; and 3) was the later will a result of undue influence upon the testatrix. Simultaneous with the issuing of this Opinion, the court has also issued another Opinion involving the same parties and centering on the validity of the testatrix's living trust and the effect of a will on that trust.

## I. FACTS

The deceased testatrix Margarita Savain ("Savain") was born on November 10, 1918. Petitioner Ruth Robson ("Robson") was a close friend of Savain from childhood. Robson's mother and Savain's mother were good friends and had travelled to the United States from Venezuela. Both families lived in Bronx, New York. Savain was twelve to fourteen years older than Robson and, although they did not live together, they soon developed a sisterly relationship with Savain taking care of Robson.[2]

In the 1950s, Savain got married and moved with her husband to the Virgin Islands. Robson soon followed. Ecedro Rabsatt

---

[1] Attorney Rettew represented Petitioner Robson at the trial in December, 1997, but subsequently died.

[2] Robson has been referred to as Savain's "niece" or "godchild" at various times. However, there was no blood, legal, or religion-imposed relationship between them. Robson was the godchild of either Carmen Ziri, Savain's sister, or Julia Ziri, Savain's mother. At the time of trial, Robson was not certain which.

("Rabsatt") met Savain and her husband in the 1960s. A close relationship developed between Rabsatt and Mr. Savain as they enjoyed many similar activities, especially the sport of fighting fowl. Rabsatt was a contractor and built for the Savains a three bedroom home with a garage on Parcel No. 41 Caret Bay ("the property") on St. Thomas. Mr. Savain died in the 1970s. Savain had no relatives on St. Thomas and only a few friends.

After Mr. Savain died, Rabsatt began assisting Savain because of the close relationship he had with her husband. From the early 1980s to 1992, Rabsatt went to the property on an almost daily basis. Savain allowed him to raise chickens on the property, and he was often there caring for the chickens and maintaining the grounds. He renovated the garage into a separate rental unit so that Savain could have sufficient income to pay the mortgage on the property. Until the construction was completed, Rabsatt assisted Savain in paying the mortgage for a period of time. He also built a two bedroom wood structure which Savain rented out. Their relationship was one of respect and mutual affection.

Robson lived on St. Thomas for approximately twenty years, and part of that time, in the late 1960s, lived with Savain at the property. Robson moved to Florida in 1990 and visited Savain on her birthday each year until Savain died in 1992. After Robson moved, their relationship was not as close as it had once been.

On February 24, 1981, Savain established the Margarita Savain Trust ("trust") through the assistance of her lawyer and transferred the property to the trust. The trust provided that she was a life beneficiary, and upon her death, her brother Marcelo Ziri ("Ziri") was the beneficiary. However, if Ziri predeceased her, Savain named Robson as the contingent beneficiary. The specific facts and legal issues pertaining to the trust are addressed in detail in a Memorandum Opinion of even date. Subsequently, on October 7, 1983, she again sought the assistance of a lawyer, Thomas Moore, Esq., in regard to executing a will and amending her trust. On that date, she signed a will making her brother the sole beneficiary of her estate; and if he predeceased her, Robson would be the beneficiary. This instrument will be referred to as Will No. 1.

Savain was an incessant cigarette smoker. In approximately 1990, she began losing weight and her health deteriorated. Rabsatt

assisted Savain by running errands for her and taking her to the doctor. In 1991, she was hospitalized on St. Thomas for approximately two weeks and diagnosed as suffering from cancer. Savain, however, never complained about her health to anyone.

On March 30, 1992, Robson came to St. Thomas and stayed until April 6. In addition to Savain, she had a son and a granddaughter who lived here. After Robson returned to Florida, Rabsatt telephoned her and asked her to consider taking Savain to live with her in Florida. Robson, though, declined to do so.

In early April, 1992, Rabsatt, concerned about Savain receiving regular meals at her home, looked into enrolling Savain in the government food program "Meals on Wheels". He was told that he needed a power of attorney from Savain to make arrangements for her. He spoke to Savain and she asked him to have the power of attorney prepared. He then asked Rita James ("James") to prepare a power of attorney. James was a legal secretary and a notary public and was the common law wife of Rabsatt's friend Alvin Canton ("Canton") James prepared the power of attorney and on either April 3 or 4 went with Canton to Savain's home where Savain signed the power of attorney and James notarized it. The power of attorney gave Rabsatt general powers to act on behalf of Savain.

Approximately two weeks later, Savain decided that she wanted to have a new will prepared. She asked Rabsatt to have James come by her home to discuss it. Rabsatt did so. Three or four days later, Canton and James met Rabsatt at Savain's home. Savain was in bed and James went in the bedroom to speak to her. Rabsatt and Canton remained in the living room. Savain was alert and met with James for about fifteen minutes. Savain told James that she wanted Rabsatt to inherit the property.

On April 29, 1992, Savain was taken by ambulance and admitted to the hospital. She was initially diagnosed as suffering from malnutrition and dehydration. Later, she was diagnosed with advanced cervical cancer and had a poor prognosis and a short life expectancy. Dr. Edward Saunders was her primary treating physician at the hospital.

Rabsatt telephoned Robson in Florida and told her that Savain had been admitted to the hospital. Robson said that she did not

have the money to travel. Rabsatt suggested to Robson that he could send her the money so that she could travel or he could purchase the ticket for her. Robson decided to charge the cost of the ticket on her credit card and they both agreed that Rabsatt would reimburse her, which he subsequently did.

From May 7 to May 8, 1992, Dr. Murli Daswani treated Savain as Dr. Saunders went off-island. On May 7, Dr. Daswani found Savain suffering from extreme pain and prescribed 50 milligrams of demerol to be administered intramuscularly every six hours, twenty four hours a day. Demerol is a narcotic medication that relieves pain. Its side effects are a decrease in the clarity of thinking and drowsiness. The nurses' notes show that demerol was first administered on May 7 at noon and continually thereafter through May 12 at 2:00 a.m. An automatic stop order was then issued pursuant to a hospital regulation which required that prescriptions for narcotic medications be renewed every certain number of hours. The administration of demerol resumed at 8:00 p.m. that day and continued to 2:00 a.m. on May 13, when another automatic stop order went into effect, and it was never administered again.

Rabsatt visited Savain every day in the hospital. Paul Schack ("Schack"), a tenant of Savain, also visited her at the hospital. On May 8, 1992, she purportedly executed a will, Will No. 2, leaving her entire estate to Schack. Rabsatt knew nothing about Will No. 2. This will was previously declared invalid by the court as discussed in more detail in the procedural history section of this Opinion, *infra.*

On May 11, James notified Rabsatt that she had completed preparation of the will. Rabsatt picked up the will from James' office on May 12 at 3:30 p.m. and went to see Savain at the hospital. When he arrived, Savain was awake. He gave her the will and she read it. After about ten minutes, she asked Rabsatt to locate two persons who could be witnesses for the will.

Rabsatt went outside to the hallway and observed Canton approaching Savain's room. Rabsatt told Canton that he had received the will from James and had just given it to Savain to review.

Rabsatt and Canton went into Savain's room. She recognized both of them and was alert. She read the will and placed it on the

bedstand or table next to her bed. The three of them discussed her signing the will and the need for a second witness. Rabsatt agreed to go and get Randolph Thomas ("Thomas") to serve as a second witness. Thomas had known the Savains for many years and had worked with Rabsatt in constructing their home. It was also agreed that Canton would get James to serve as a notary. According to the nurses' notes, at the time of Savain's meeting with Canton and Rabsatt, approximately 4:00 p.m., Savain was comfortable and oriented to person, time and place.

Sometime around 6:00 p.m., Canton returned with James to Savain's room. As they entered the room, Savain recognized them. She had the will in her hands and was on the bed reading it. Savain told James that she was ready to sign the will. Thomas then arrived in the room. Savain recognized him and addressed him by his nickname "Nocka'; joked with him about getting old; and asked him "did Sweets (Rabsatt's nickname) tell you about signing the will?" Thomas responded "yes".

Savain signed the will and then gave it to Thomas. Thomas signed it as a witness and gave it to Canton. Canton also signed it as a witness and gave it to James. James notarized the will and gave it to Rabsatt. The entire meeting in Savain's room lasted about twenty to twenty-five minutes.

The nurses' notes show that between 6:00 p.m. and 7:00 p.m., visitors were at Savain's bedside. She was "resting quietly" and her condition remained "unchanged".

Repeatedly during her hospitalization, Savain told Dr. Saunders that she wanted to go home. Dr. Saunders discussed this with the nursing staff and Rabsatt, as he believed Rabsatt was her son since Rabsatt had given him a copy of the power of attorney. He also discussed the ramifications with Savain. On May 19, 1992, Savain was released from the hospital "against medical advice". Rabsatt arranged for Doris Powell to stay with Savain at her home, as Savain was bedridden, to take care of all her needs Ms. Powell did everything that was necessary to ensure that Savain's needs were met, including feeding and bathing her.

Robson eventually came to St. Thomas on May 21. Savain died on May 24, 1992.

## II. PROCEDURAL HISTORY

Following Savain's death, Robson, Schack and Rabsatt filed petitions in the Territorial Court to probate their respective wills. The issues of the validity of Wills No. 2 and 3 were tried before the Honorable Almeric A. Christian on December 10, 1992. In a Memorandum Opinion dated March 5, 1993, Judge Christian held that both wills were not valid as the testatrix did not satisfy the request and publication requirements of V. I. Code Ann. tit. 15 § 13 (1985). Both Schack and Rabsatt appealed this decision to the Appellate Division of the District Court of the Virgin Islands, and that court affirmed the decision in *Rabsatt v. Estate of Savain*, 31 V.I. 237, 878 F. Supp. 762 (App. Div. 1995). Both parties again appealed the cases to the Third Circuit Court of Appeals. In an unpublished opinion issued on November 27, 1995, the Court of Appeals affirmed the decision as to Will No. 2, and reversed as to Will No. 3. It remanded, holding, in pertinent part, that in regard to Will No. 3, the Territorial Court had only determined whether the testatrix substantially complied with the publication and request requirements as to one witness, Thomas,[3] and not as to the second witness, Canton; and that the court should address the additional issues of whether the testatrix was competent when she executed Will No. 3 and whether that will was a result of undue influence.

This court held a trial on these issues on December 11 and 15, 1997. Counsel requested time within which they could file written final arguments containing additional research on these issues. The court allowed each party time within which to do so and took the matter under advisement.

## III. LEGAL DISCUSSION

### A. Will No. 1 and the requirements of 15 V.I.C. Section 13

The issue of the validity of Will No. 1 has not been addressed previously. No testimony or other evidence was presented at the December 10, 1992 hearing before Judge Christian regarding this issue. In the Memorandum Opinion dated March 5, 1993, at page

---

[3] The Third Circuit Court of Appeals referred to this witness as "Rabsatt" but this court deems such a reference to be an inadvertent error as the correct name of the witness was Thomas.

8, the court noted that no persons who were witnesses to or the notary for that proposed will appeared at the hearing and the court further specifically stated that the hearing would take place at some subsequent time. Counsel agreed at the hearings before the undersigned that the issue of the validity of Will No. 1 must be addressed by the court.

Counsel further agreed to take the deposition of Savain's former counsel, now Chief Judge Thomas Moore ("Moore") of the District Court of the Virgin Islands, Division of St. Thomas and St. John, and that the deposition testimony could be admitted in evidence without requiring his personal appearance at the trial. On December 30, 1997, the deposition of Moore was taken and a transcript of his testimony was subsequently filed with the court. Will No. 1 was never identified or admitted at either of the December hearings as Robson was relying on the testimony of Moore to lay the adequate foundation so that the document could be admitted in evidence.

Specifically in regard to Will No. 1, the court finds as follows. On October 7, 1983, Savain was in Moore's office pertaining to executing the will. He served as the notary for the will. Three employees of Moore's firm — Nancy Dillon, Katherine Galle, and Patricia Boylan — were in Moore's office to serve as witnesses and Savain was introduced as the testatrix. On behalf of Savain, Moore stated that the document to be signed was her will. He had Savain sign the instrument on page 1 and initial it at the bottom; initial it on page 2; and write in the date and initial and sign it on page 3. After Savain completed signing the document, he placed each of the subscribing witnesses under oath; had them read the affidavit that followed the last page of the will; and sign it. Moreover, he ensured that all persons were present in the room at the same time and that the witnesses actually saw Savain sign the will. He further asked the witnesses to serve as witnesses to the will on behalf of Savain.

According to 15 V.I.C. § 13, a last will and testament must be executed and attested in the following manner:

(1) It shall be subscribed by the testator at the end of the will.

(2) Such subscription shall be made by the testator in the presence of each of the attesting witnesses, or shall be

98

acknowledged by him, to have been so made, to each of the attesting witnesses.

(3) The testator, at the time of making such subscription, or at the time of acknowledging the same, shall declare the instrument so subscribed, to be his last will and testament.

(4) There shall be at least two attesting witnesses, each of whom shall sign his name as a witness, at the end of the will, at the request of the testator.

In *Rabsatt v. Schack,* Nos. 95-7136 and 95-7174 (3d Cir. Nov. 27, 1995), the Third Court of Appeals reviewed New York law, from which this statute was derived, and held that "substantial compliance" with the statute's publication and request requirements was sufficient for a court to determine that a will had been validly executed. In regard to the publication requirement, "[u]nder the substantial compliance approach ... no particular words are necessary to satisfy [this] requirement as long as there is some kind of communication that the instrument which the witnesses are being asked to sign is a testamentary instrument." *Id.* at 8. In regard to the statute's request requirement, moreover, "testimony that the testatrix actually requested each of the subscribing witnesses to sign is not required to validate a will." *Id.* at 9.

The court concludes that the document that was marked exhibit 1 to the deposition transcript, Will No. 1, should be admitted as Robson's exhibit for trial. Rabsatt has not submitted any objections to or arguments against its admission and the court deems that the Federal Rules of Evidence have been satisfied justifying its admission in evidence as Robson's exhibit 1.

The court further concludes that there was substantial compliance with the requirements of section 13 and that the will was validly executed in accordance with Virgin Islands law. Savain went to her lawyer's office on October 7, 1983. She signed the will in the presence of three attesting witnesses and in the presence of her lawyer. Her lawyer subsequently notarized her signature and the signatures of the three attesting witnesses. Although she did not announce to the witnesses that this was her will, her attorney did so on her behalf, in her presence, and in the presence of the three attesting witnesses.

■ Rabsatt has not filed a declaration of contest to this will.[4] As a testamentary document that complies with section 13 and that appears on its face to comply with all other requirements, including testamentary capacity, Will No. 1 is presumed to be valid. *Rabsatt v. Schack,* 31 V.I. at 242 n. 8, 878 F. Supp. 762.

## B. Will No. 3 and the testatrix's soundness of mind

Robson argues that Savain lacked testamentary capacity pertaining to Will No. 3, primarily due to her poor health, advanced age and medicated condition at the time she signed it. Testamentary capacity is, therefore, a critical issue to be decided by the court.

Virgin Islands law provides that "[a]ll persons, except idiots, persons of unsound mind and persons under eighteen years of age, may devise their real property, by last will and testament ...." 15 V.I.C. § 2. No definition is provided in the statute for "unsound mind" and there is no Virgin Islands caselaw that can assist the court in interpreting this section. The legislative history of the statute establishes that the section "was derived from section 10 of former New York Decedent Estate Law'; however, that section was repealed in 1966.

As they pertain to the execution of wills, the words "sound mind" mean "the ability of the testator 'to mentally understand in a general way the nature and extent of the property to be disposed of, and the testator's relation to those who would naturally claim a substantial benefit from the will, as well as a general understanding of the practical effect of the will as executed.'" *Skelton v. Davis,* 133 So. 2d 432, 435 (Fla. Dist. Ct. App. 1961) (citation omitted). A testatrix's use of medication, and her illness, weakness and approaching death do not render her incompetent to make a will. "The question instead, is whether, in spite of these things, the testatrix had sufficient mental capacity to bring to the making and execution of the will the judgment which the law requires of a testatrix." D. E. Buckner, Annotation, *Testamentary Capacity as Affected by Use of Intoxicating Liquor or Drugs,* 9 A.L.R. 3d 15, 121 (1966 and Supp. 1997). Individual reactions to medication vary

---

[4] Rabsatt did file a Declaration of Contest in the Territorial Court on July 14, 1992 in which he contested Will No. 2 and the related Petition for Probate and Letters Testamentary.

greatly. Of critical concern, therefore, is the testatrix's mental condition at the time she executed the will. *Id.*

Additionally, courts have held that incapacity resulting from the use of pain-killing drugs is "temporary or ephemeral in its nature." *Id.* at 123. It may, therefore, appear in some instances that prior to and after the making of a will, the testatrix was so affected by medication or by the combination of the medication and the illness that the testatrix did not have the capacity to make a will. In such cases, the courts have further held that 'evidence of incompetency on other occasions gives rise to no presumption that such incompetency existed at the time the will was made, or that it was incumbent upon the contestant ... to show that the temporary causes were operating at the time the will was made." *Id.* Indeed, a testatrix who executed a will during a lucid interval was held to have possessed testamentary capacity. *In re Estate of Blakey*, 363 So. 2d 630 (Fla. Dist. Ct. App. 1978).

Robson directs the court's attention to the hospital's records and Dr. Daswani's testimony.[5] She argues that Savain was placed on demerol, a narcotic-medication that made her sleepy, on May 7 and she was given the medication through the early morning of May 12. Robson argues further that, during her hospitalization, Savain was confused at times and disoriented frequently as to time and place. Moreover, she relies heavily on Dr. Daswani's expert opinion that, based on the amount of demerol she was prescribed, when he treated her, she would not have had the mental capacity to make reasonable decisions regarding her personal affairs. Robson's assertions are accurate but do not establish Savain's unsoundness of mind on May 12 when she executed the will at approximately 6:00 p.m.

After a detailed analysis of the hospital's records, the court finds as follows. Dr. Daswani prescribed 50 mg. of demerol on May 7 and it was first administered to Savain on that day at noon.

---

[5] Robson also refers the court in her post-trial brief to guidelines purportedly released by the U.S. Department of Health and Human Services and attaches a copy as "Exhibit 2.5". She asks the court to consider this information in making its decision. She, however, has not established the basis for its admission as an exhibit and consideration by the court. The last hearing was held in this matter on December 15, 1997, and the only additional evidence this court will consider at this point is the deposition transcript of Moore, pursuant to the stipulation of counsel.

101

Thereafter, through May 12 at 2:00 a.m., this same dosage was administered four times a day. On May 12 at 8:00 a.m., an automatic stop order went into effect and Savain was not administered the medication again until 8:00 p.m. that day.

According to the nurses' notes, on May 11, the day prior to her executing the will, Savain was confused at noon yet at 4:00 p.m., she knew who she was, where she was, and what time it was (oriented times three or "0x3" in the medical abbreviation) and was "resting quietly". At 6:00 p.m., she ate a portion of her dinner and then rested "quietly". At 8:00 a.m. on May 12, she was still resting quietly. After she was checked by the nurse, she appeared to be "confused" at times. At 10:00 a.m., she continued to rest quietly and had no complaints. At noon, she ate a portion of her lunch and continued to rest quietly and sleep "intermittently". At 2:00 p.m., she appeared to be "comfortable" and was "sleepy". At 4:00 p.m., she was still "comfortable" and totally oriented (0x3). At this time, Rabsatt and Canton were at her bedside. Between 6:00 p.m. and 7:00 p.m., she was "resting quietly" with visitors at her bedside and her condition remained "unchanged".

The only expert testimony before the court pertaining to Savain's testamentary capacity on May 12 was from Dr. Saunders. He opined that the demerol administered to her earlier that day at 2:00 a.m. did not effect her mental capacity.

It is evident, therefore, that at particular times, Savain was totally oriented while at other times, she was confused or partially oriented. The critical day of concern for the court, though, is May 12. From 10:00 a.m. to 7:00 p.m., she did not have any complaints and was totally oriented and comfortable. She had the opportunity to and did read the will before signing it. Rabsatt, James and Canton all testified that she was alert, recognized them, joked with Thomas, and understood that what she was reading and signing was her will.

Dr. Daswani's and Dr. Saunders' diverging opinions can be easily reconciled. Dr. Daswani's opinion pertained to the two days he treated Savain while she was being heavily medicated with demerol and her physical and mental condition at the time. Dr. Saunders' opinion was based on Savain's condition four days later and after demerol had been administered about sixteen hours earlier.

■ This court cannot conclude that Savain was of an unsound mind when she executed the will. Roth Rabsatt and Robson were her longtime friends. By executing the will, Savain was not disinheriting any natural heir or relative but choosing one friend over another.

### C. Will No. 3 and Section 13's Publication and request requirements

As mentioned previously, the Third Circuit Court of Appeals remanded to this court the issue of whether Savain had substantially complied with section 13's publication and request requirements in regard to the second witness Alvin Canton. The court concludes that she did.

As noted earlier, in regard to the publication requirement, "no particular words are necessary ... as long as there is some kind of communication that the instrument which the witness[s] [is] being asked to sign is a testamentary instrument." *Rabsatt*, Nos. 95-7136 and 95-7174, slip op. at 8. The Court of Appeals noted that New York law required only that, as between the testator and the witness, "there was some meeting of the minds upon the understanding that the instrument was the testator's will." *Id.* at 9 (citation omitted). In regard to the request requirement, "testimony that the testatrix actually requested each of the subscribing witnesses to sign is not required to validate a will." *Id.* This court, therefore, is required to look at all the circumstances surrounding the execution of the will to determine if there was such an understanding and if the witness indeed signed at the testatrix's request, and not simply at whether the testatrix made the announcement and personally invited the witness to attest the will.

■ All the facts surrounding Savain's signing of the will and Canton's attestation evidence that there was a meeting of the minds between Canton and Savain that the document she was signing was her will and that Canton was signing the document at her request. Canton had visited Savain on the afternoon of May 12 just after Rabsatt had given her the will to read. When Canton and Rabsatt entered Savain's room, she recognized them. All three of them spoke for approximately ten minutes regarding signing the will and it was agreed that another witness was necessary and that

Rabsatt would obtain a second witness and Canton would locate and bring James to notarize the will. Less than two hours later, Canton arrived with James. Savain immediately recognized them both and had the will in her hands. Savain told James, in Canton's presence, that she was ready to sign the will. Savain then signed the will; Thomas next signed as a witness; and Canton signed as the second witness.

## D. Will No. 3 and undue influence upon the testatrix

Robson asks the court to declare Will No. 3 invalid due to Rabsatt's undue influence on Savain. Rabsatt counters that Savain knowingly and voluntarily executed the will and the will contained her true desires.

"Undue influence is not a concept susceptible of unitary definition. The essence of the idea is the subversion of another person's free will in order to obtain assent to an agreement." *Francois v. Francois*, 599 F.2d 1286, 1292 (3d Cir. 1979). Where a testator is improperly induced to execute an instrument, in reality, the instrument is not that of the testator as the judgment of another person has been substituted. *In re Estate of Caron*, Probate No. 141/77, slip op. at 22 (Terr. Ct. Apr. 28, 1986). The proper inquiry for a court is "not just whether persuasion induced the transaction but whether the result was produced by the domination of the [other's] will ... by the person exerting undue influence." *Francois*, 599 F.2d at 1292; *see also In re Estate of Walters*, 38 V.I. 14 (Terr. Ct. 1997).

Before the court can analyze the law with the facts, it must establish each party's burden of proof on this issue. In a case involving allegations of undue influence pertaining to a donor's execution of a deed to a non-relative, the Third Circuit Court of Appeals, in *Joseph v. Eastman*, 344 F.2d 9, 12 (3d Cir. 1965), established the burden as follows:

> Where the donor of a gift is aged and physically infirm and a relationship of trust and confidence existed between the donor and the donee, the gift is presumed to have been induced by fraud or undue influence and the burden shifts to the donee to show affirmatively and by clear and convincing proof that no deception was prac-

ticed, no undue influence was used, and that all was fair, open, voluntary and well understood.

Subsequently, in *Francois*, 599 F.2d at 1292, a case involving allegations of a wife's undue influence upon her husband in the execution of a property settlement agreement, the Court of Appeals affirmed this shifting of the burden: "in relationships of trust or confidence the burden of proof shifts to the person seeking to uphold the transaction to demonstrate the absence of undue influence."

There are no published decisions in the Virgin Islands pertaining to the burden of proof in contested will cases. In an unpublished decision, *In re Estate of Caron*, slip op. at 23, the Territorial Court followed *Joseph* and *Francois* to an extent by holding that, where there is a confidential relationship, the burden of proof shifts and the obligation of disproving any undue influence is imposed on the beneficiary. However, that court further held that, once the burden shifted, the beneficiary's standard of proof is by a preponderance of the evidence.

■ There are three standards or levels of proof. On one end of the spectrum is the mere preponderance of the evidence which applies to a typical civil case. On the other end, is proof beyond a reasonable doubt, which is required in criminal cases. The "intermediate standard" is proof by clear and convincing evidence which is used in certain civil cases "to protect particularly important individual interests." *Addington v. Texas*, 441 U.S. 418, 424, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). The preponderance of the evidence standard, therefore, imposes a lesser burden of persuasion than the clear and convincing evidence standard. This court holds that the appropriate burden to be imposed on the beneficiary in contested will cases involving this issue is clear and convincing proof, as enunciated by the Third Circuit Court of Appeals in *Joseph* and *Francois*.

### 1. Age, Infirmity and Confidential Relationship

Robson must establish that Savain was aged and infirm and had a confidential relationship with Rabsatt for the rebuttable presumption of undue influence to arise. This court concludes that she has established all of these factors.

Savain was 74 years old when she executed the will and can be deemed to be aged. Also, she was ill, having been diagnosed with terminal cancer. However, as the court noted earlier, when she signed the will, she was alert and oriented to time, place, and persons. She recognized all the persons in the room and even joked with Thomas. There was no testimony or other evidence provided that she was disoriented in any way.

In determining whether Rabsatt and Savain had a confidential relationship, there are a number of factors this court must examine, including the following: the amount of time the beneficiary spent with the testatrix; whether the beneficiary handled many of the testatrix's personal or business affairs; and whether the testatrix ever sought the advice of the beneficiary. These factors are not exhaustive but are the significant ones to be considered. *In re Estate of Smith*, 481 N.W.2d 471, 474 (S.D. 1992); *In re Estate of Caron*, Probate No. 141/77. In essence, the court must review all the facts surrounding Rabsatt's and Savain's relationship.

■ In 1990, after her health began to worsen, Savain began to rely on Rabsatt's assistance more and more. Savain had no relatives in the Virgin Islands. Robson had moved to Florida and was not available to provide the necessary support. Rabsatt stopped by the house daily to check on Savain. He ran errands for her and took her to see the doctor. He continued to assist in maintaining the grounds. In early April, 1992, she granted Rabsatt a power of attorney authorizing him to handle "all matters pertaining to my business affairs"; and specifically further authorized him to sign her checks and make deposits. There is no evidence before the court that Rabsatt ever used the power of attorney for any purpose other than obtaining meals for her through the government program. Nevertheless, after looking at all the facts, the court concludes that there was a confidential relationship between them.

## 2. Shifting of the Burden

■ As there was a confidential relationship between Savain and Rabsatt, and therefore, a presumption of undue influence, the burden shifted to Rabsatt to come forward with clear and convincing evidence that there was no undue influence. This court concludes that he has done so. It finds that there was no improper

influence or deception used to procure the will, and it was Savain's desire to distribute her estate to him. Savain decided before she was hospitalized on April 29 that she wanted a new will drafted providing for Rabsatt as the sole beneficiary. She asked Rabsatt to have James come to see her about the will. Rabsatt followed through with Savain's instructions and arranged for James to come to Savain's home. Savain met with James sometime during the last week of April for approximately fifteen minutes and told James that she specifically wanted Rabsatt to inherit her property. Apparently, there was no rush to have the will prepared as it took James over two weeks to do so.

When Savain executed the will on May 12, she was competent and was under no deception, fraud, or pressure. She had possession of the instrument for at least two hours before she signed it and she read it. The instrument is short with the critical portions containing the devise and bequeath to Rabsatt consisting of one and one-half pages. As has been stated repeatedly, when the various persons came into her hospital room on the early evening of May 12, she was alert; recognized them; and even joked with one of them. Savain further told James that she was ready to sign her will.

Influences based solely on friendship, affection, and kindness between persons do not amount to undue influence. *Barry v. American Security and Trust Co.*, 77 U.S. App. D.C. 351, 135 F.2d 470 (D.C. Cir. 1943). "Something more than the influence of affection or attachment, or the mere desire of gratifying the wishes of another, must be established to sustain the allegation in a will contest that the will was procured by undue influence." 79 Am. Jur. 2d *Wills* § 400 at 558 (1975).

Rabsatt established that he was a loyal friend of Savain for over thirty years. After her husband died, Rabsatt was determined to assist Savain and he did so diligently without any improper intent.

## IV. CONCLUSION

Even though Will No. 1 was a proper testamentary instrument, the court will admit to probate Will No. 3 as that instrument was, indeed, Savain's last will and testament. By executing Will No. 3, Savain had revoked Will No. 1. In a Memorandum Opinion issued

simultaneously with the instant one, the court held that Savain's living trust was legally valid and enforceable and that Will No. 3 did not revoke the trust. As a result, Will No. 3 can only distribute Savain's personal property to Rabsatt as the living trust provided for the real property to be distributed to Robson. An appropriate Order will be entered.