**DIANE ROSS and IKE BRACY, Appellants/Defendants**

**v.**

**HAROLD HODGE, Appellee/Plaintiff**

S. Ct. Civ. No. 2010-0089

Supreme Court of the Virgin Islands

March 7, 2013

293

DIANE ROSS, IKE BRACY, St. Croix, USVI, *Pro se*.

MARTIAL A. WEBSTER, ESQ., Law Office of Martial A. Webster, St. Croix, USVI, *Attorney for Appellee*.

HODGE, *Chief Justice*; SWAN, *Associate Justice*, and DUNSTON, *Designated Justice*.[1] HODGE, *Chief Justice*, concurring in part and dissenting in part.

## OPINION OF THE COURT

(March 7, 2013)

DUNSTON, *Designated Justice*. Harold Hodge sued Diane Ross and Isaac "Ike" Bracy for unjust enrichment, conversion, and fraud. In

---

[1] Associate Justice Maria M. Cabret has been recused from this matter. The Honorable Michael C. Dunston sits in her place by designation pursuant to title 4, section 24(a) of the Virgin Islands Code.

response, Bracy counterclaimed against Hodge and Hodge's daughter Nathalie for breach of contract.[2] At trial, Hodge prevailed on his claims for unjust enrichment and for conversion but lost on his claim for fraud, and Bracy lost on his counterclaim for breach of contract. The Superior Court awarded Hodge an equitable lien on Ross' property to compensate Hodge for the unjust enrichment, and the jury awarded Hodge a monetary judgment to compensate Hodge for the conversion. Bracy appealed those decisions. For the reasons stated below, we reverse both the Superior Court's decree entering an equitable lien on Ross' property, and the Superior Court's monetary judgment against Ross and Bracy for conversion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Harold Hodge owns and operates multiple businesses, all of which perform services in the construction industry.[3] In 1996, Hodge hired Bracy to assist him with federal contract claims and to help prepare a claim against the federal government for discrimination regarding one of Hodge's bids for a federal contract. In exchange for this assistance, Hodge orally agreed to pay Bracy $650 a week plus an additional $650 a month for lodging. Four years later, in 2000, Hodge, his daughter Nathalie, and Bracy, all executed a Professional Services Agreement ("PSA"), agreeing to pay Bracy a percentage of eight contracts which Hodge's various companies had entered into.

Although Bracy's oral contract provided him $650 a month for housing, in 1997 Hodge sought to purchase a house for Bracy to live in.[4] Bracy and his girlfriend, Diane Ross, located a property for Hodge to purchase, No. 25 Estate Mahogany Welcome, and Hodge provided Bracy with the money to make the purchase. Hodge, Bracy, and Ross all signed the Offer to Purchase the property, and the deed was put in the names of

---

[2] Ross also counterclaimed alleging slander of title. However, the jury found that Hodge did not slander Ross' title to No. 110 Work and Rest, and Ross did not appeal that decision. Accordingly, that claim is not before this Court.

[3] Hodge owns and is the president of Hodge Heavy Equipment, he is a director of Harold Hodge II, Inc., which is owned by his daughter Nathalie Hodge, and he is the president and a shareholder of HAP Construction, Inc.

[4] Although the parties dispute whether Hodge purchased this house for his employees to live in or for Bracy specifically as an advance on Bracy's housing allowance, there is no dispute that Hodge paid for the house.

all three as tenants in common, but in March 2000, Hodge and Bracy quitclaimed their respective interests in the property to Ross. Then, in June 2000, Ross obtained a loan in the amount of $70,800 using the property as collateral. After she paid the closing costs and paid off a personal loan, Ross deposited the remaining $56,716.50 into her personal bank account and used part of the money to renovate the property.[5] Later, in October of that year, Ross took out another loan, this one in the amount of $126,000, using her former marital home — located at No. 110 Work and Rest a.k.a. No. 110 Rosegate — as collateral. Ross used that $126,000 to pay off an existing mortgage on No. 110 Work and Rest of approximately $87,000 and to buy out her ex-husband's interest in that property for $25,000. Ross used the remaining money, approximately $15,000, to repair that property. Two years later, Ross sold No. 25 Mahogany Welcome for $103,000. Ross used that money to pay off the remaining balance of the mortgage on No. 25 Mahogany Welcome, which was approximately $70,000. Ross deposited the remainder of the proceeds into a bank account she shared with Bracy and spent the money on everyday expenses.

On January 21, 2003, Hodge filed a complaint against Ross and Bracy in the Superior Court alleging that they fraudulently obtained No. 25 Mahogany Welcome, breached a fiduciary duty to Hodge, unjustly enriched themselves at Hodge's expense by purchasing a property in their names as well as Hodge's name in violation of the trust Hodge placed in them to purchase a property for Hodge's employees to live in, and converted his property.[6] Bracy counterclaimed, alleging that both Hodge and his daughter Nathalie breached their contract with him by failing to pay him the percentages of the contracts he was due under the PSA. The Superior Court decided to bifurcate the issues, with the jury determining some issues — conversion, fraud, and breach of contract — and the court determining whether Ross and Bracy were unjustly enriched because they

---

[5] Ross could not recall how much of the $56,716.50 she used to renovate the property and there is no evidence as to how she used the remainder of the money.

[6] Hodge's complaint alleged that Ross and Bracy "converted the property to themselves," apparently referring to the real property located at No. 25 Mahogany Welcome. (J.A. vol. VI, 1871.) Although Hodge's complaint appears to refer to the conversion of real property, the Superior Court instructed the jury that the conversion at issue was the "proceeds from the mortgage and sale of Plot Number 25 Mahogany Welcome." (J.A. vol. IV, 1254.)

exercised undue influence over Hodge to obtain No. 25 Mahogany Welcome.

At trial,[7] Hodge called himself, his wife Linda, and Ross to testify in support of his theory that he intended to purchase No. 25 Mahogany Welcome for his employees to live in and that Ross and Bracy swindled him out of the property.[8] In response, Ross and Bracy called Bracy and Julia Santos,[9] the notary who notarized the quitclaim deed transferring Hodge's interest in No. 25 Mahogany Welcome to Ross.

Linda testified first, stating that both she and Hodge were good friends with Ross and Bracy. Linda further testified that both Ross and Bracy possessed experience purchasing real estate, and, based on that experience, Hodge and Linda asked Ross and Bracy to look for a house where Hodge's employees could stay.[10] Finally, Linda added that she and Hodge trusted Ross and Bracy to purchase this home.

Hodge testified later in the trial, stating that he trusted Bracy as a friend and that he became close friends with Ross. Hodge also testified that he gave Bracy the authority to find a house for his employees to live in with the understanding that Bracy would purchase the house in the name of one of his companies.[11] Hodge testified that he cannot read but nevertheless admitted to signing an offer to purchase No. 25 Mahogany Welcome. Although Hodge paid for the house in 1998, he said that he did not learn that the deed for the property was put in his name as a tenant in common with Ross and Bracy until October 23, 2001. Significantly, that was after the time when, according to Hodge, Ross asked him to use the property to take out a loan to renovate Ross' other property, No. 110 Work and Rest. Specifically, Hodge said that when he and his wife were in the bank where Ross worked, Ross asked Hodge to sign a document so she could use No. 25 Mahogany Welcome as collateral for a loan. Hodge further testified that he, his wife Linda, and Ross went next door to a

---

[7] The trial lasted four days, beginning on February 8, 2010 and ending on February 11, 2010.

[8] Hodge's daughter Natalie also testified, but her testimony is largely irrelevant to the issues raised in this appeal.

[9] Ross and Bracy also called Paul Gillette. Gillette's testimony is also irrelevant to the issues considered in this appeal.

[10] Linda testified that she did not know how to purchase real estate.

[11] Hodge testified that he has purchased real estate before and understands what a closing is, but that his attorney handles those affairs for him and explains the documents to him.

298

notary where he signed what he thought was a document for Ross to get the loan, but turned out to be a quitclaim deed.[12] Finally, Hodge testified that he learned in 2002 that No. 25 Mahogany Welcome had been sold.

Ross testified that she purchased No. 25 Mahogany Welcome, because she and Bracy wanted to find a home and because Hodge agreed to pay for the house in exchange for Bracy waiving his right to future housing allowance payments. Ross further testified that she and Bracy made two offers to buy the house without asking Hodge to sign those offers, but that Hodge signed the third and final offer to purchase the property. Ross also admitted that even though Hodge paid for the property, he was not at the closing and she did not inform Hodge about the closing. According to Ross, she and Bracy closed on the property in February of 1998 and moved into the property in July of 1998. Ross claimed that two years later, in 2000, she went to both Hodge and Bracy and asked them to quitclaim their respective interests in the property to her, and that they did so voluntarily. Ross said that she sold No. 25 Mahogany Welcome two years after that for approximately $103,000. After paying off the mortgage she had taken out on the property in June of 2000, Ross was left with approximately $28,000. She testified that she put that money into a joint account she shared with Bracy and used it for daily expenses. Ross also expressly stated that not a penny was used from that joint account to do any repairs on No. 110 Work and Rest, because those repairs were completed in 2001.[13]

Finally, Santos testified that she did not know Ross, Bracy, or Hodge very well and was not friends with any of them, but that she notarized a quitclaim deed transferring Hodge's interest in No. 25 Mahogany Welcome to Ross. Santos said that Hodge and Ross came into the automobile dealership where she worked and Ross presented her with the quitclaim deed. Santos testified that she asked Hodge if he was transferring the deed to Ross and that he replied affirmatively.

Based on that evidence, the jury found that Bracy and Hodge did not fraudulently place their names on the deed to No. 25 Mahogany Welcome,

---

[12] Linda testified that she saw that the instrument Ross asked Hodge to sign was a quitclaim deed, but did not understand what a quitclaim deed was at that time. Linda further testified that no one explained to Hodge what he was signing and that Ross indicated the document was necessary for her to take out a loan.

[13] Bracy's testimony is not particularly helpful in resolving the issues on appeal, as he simply reiterated Ross' testimony.

but did wrongfully convert the proceeds from the sale of No. 25 Mahogany Welcome and awarded Hodge a judgment for $70,000. The jury also found that Hodge did not breach any contract he had with Bracy.[14] Approximately four and a half months later, on August 6, 2010, the Superior Court issued a decree setting forth "Findings of Fact and Conclusions of Law," in which it found that Ross and Ross alone was unjustly enriched because she acquired No. 25 Mahogany Welcome by exercising undue influence over Hodge. (J.A. vol. I, 4-12.) As a result of this undue influence, the court imposed an equitable lien upon No. 110 Work and Rest. However, to prevent an improper windfall to Hodge, the court forced Hodge to elect either the monetary judgment or the equitable lien. Hodge elected the equitable lien.

On September 2, 2010 Ross and Bracy ("Appellants") filed a timely appeal of both the Superior Court's "Findings of Fact and Conclusions of Law" as embodied in the August 6, 2010 Decree and the Superior Court's August 12, 2010 Judgment entered against the Appellants on the conversion count. *See* V.I.S.CT.R. 5(a)(1). On appeal, the Appellants argue that the Superior Court erred by (1) finding that Ross exerted undue influence over Hodge to acquire No. 25 Mahogany Welcome, (2) granting Hodge an equitable lien in property owned by Ross, (3) denying their motion for directed verdict on Hodge's conversion claim, (4) dismissing Bracy's counterclaim against Nathalie Hodge, and (5) preventing the jury from considering certain portions of the Professional Services Agreement.

## II. JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction over this civil appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." The August 6, 2010 Decree and the August 12, 2010 Judgment based thereon dispose of all the claims submitted to the Superior Court for adjudication, and therefore constitute final decrees and orders from which an appeal lies. *See, e.g., Bryant v. People*, 53 V.I. 395, 400-01 (V.I. 2010) (explaining that final judgment is one which ends the

---

[14] The jury was not allowed to consider the breach of contract claim against Nathalie Hodge, because the court dismissed that claim prior to trial on the grounds that Bracy never served Nathalie Hodge with the counterclaim.

litigation on the merits and which disposes of the whole subject of the litigation).

The standard of review for our examination of the Superior Court's application of law is plenary, while the Superior Court's factual findings are reviewed only for clear error. *See St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007). In reviewing findings of fact for clear error, we reverse if "the trial court's determination was 'completely devoid of minimum evidentiary support' or . . . it 'bears no rational relationship to the supportive evidentiary data.' " *Hodge v. McGowan*, 50 V.I. 296, 316 (V.I. 2008) (quoting *Daniel*, 49 V.I. at 329). When a party appeals a denial of that party's motion for judgment as a matter of law, we apply plenary review. *See Mosley v. Wilson*, 102 F.3d 85, 89 (3d Cir. 1996) (citation omitted). Accordingly, we "view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the minimum quantum of evidence from which a jury might reasonably afford relief." *Id.* (internal quotation marks and citations omitted).

## III. DISCUSSION

### 1. The Superior Court did not err by finding that Ross was unjustly enriched because she exerted undue influence over Hodge to acquire No. 25 Mahogany Welcome.

The Appellants first argue that the Superior Court erred by finding that Ross exerted undue influence over Hodge to acquire No. 25 Mahogany Welcome. Specifically, the Appellants argue that the court erred by finding that a confidential relationship existed between Ross and Hodge, in which Ross was the dominant party and Hodge was the servient party. The Appellants further argue that even if the evidence established that such a confidential relationship existed between Ross and Hodge, the Appellants nevertheless rebutted the presumption that Ross exercised undue influence over Hodge to acquire No. 25 Mahogany Welcome.

At trial, Hodge and his wife Linda testified regarding their relationship with Ross and Bracy, and the circumstances surrounding Ross' acquisition of No. 25 Mahogany Welcome. Linda testified that both she and Hodge were good friends with Ross and Bracy. According to Linda, both Ross and Bracy possessed experience purchasing real estate, and based on that experience, Hodge and Linda asked Ross and Bracy to look

for a house where Hodge's employees could stay. Linda also said that she and Hodge trusted Ross and Bracy to purchase this home. Hodge added that he trusted Bracy as a friend and that he became close friends with Ross. Hodge also testified that he gave Bracy the authority to find a house for his employees to live in with the understanding that Bracy would purchase the house in the name of one of his companies. Finally, Hodge testified that he cannot read.

In addition to that testimony, the court heard undisputed evidence that Hodge, Ross, and Bracy all signed the third and final offer to purchase No. 25 Mahogany Welcome on December 3, 1997 and that Hodge paid for the property. It is further undisputed that Hodge was not present when Ross and Bracy closed on the property in February 1998 and Ross and Bracy placed their names and Hodge's name on the deed, all as tenants in common. According to Hodge, he did not find out that Ross and Bracy had included their names on the deed until 2001. Ross testified that in 2000 she went to both Hodge and Bracy and asked them to quitclaim their respective interests in the property to her, and that they did so voluntarily. Hodge disputes that claim and testified that he signed the quitclaim deed believing it to be documentation that Ross needed to obtain a loan against the property.

Based on that and the other evidence presented a trial, the Superior Court found that "Hodge trusted Bracy as an employee and friend," and that Hodge trusted "Ross as a friend and allowed both Ross and Bracy to handle most of his . . . business affairs." (J.A. vol. I, 6.) The Superior Court further found that Hodge tasked Bracy with finding a house for one of his companies, and that Bracy in turn asked his girlfriend Ross to assist him in that process. Finally, the Superior Court found that after Bracy and Ross located a property, No. 25 Estate Mahogany Welcome, they convinced Hodge that they could be trusted to complete the "purchase transaction" for the property by "[c]laiming to be knowledgeable and experienced in real estate transactions." (J.A. vol. I, 7.)

Based on those findings of fact, the Superior Court concluded that "a 'confidential relationship' existed between Ross and Hodge when Ross gained the confidence of Hodge to secure and purchase a house for HAP, Hodge's corporation." (J.A. vol. I, 10.) The court further concluded that Ross unduly influenced Hodge to first purchase No. 25 Estate Mahogany Welcome as a tenant in common with Ross and Bracy, and then transfer his interest in the property to Ross. The court determined that "[t]here was

undue influence because Ross was the 'dominant party' in the 'confidential relationship' and she professed to be knowledgeable regarding business, banking and real estate transactions," whereas Hodge was the "servient party" in the "confidential relationship," because he "was *not* knowledgeable regarding the legalities of banking and real estate transactions." (J.A. vol. I, 10.) Finally, the court concluded that, because Ross induced Hodge to transfer the property to her through undue influence, a constructive trust arose by operation of law and Ross held the property, not as an owner, but in trust for Hodge.

 " 'A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind.' "[15] *Francois v. Francois*, 599 F.2d 1286, 1291, 16 V.I. 130 (3d Cir. 1979) (quoting RESTATEMENT (SECOND) OF TRUSTS § 2 cmt. b (1959)). Here, the Superior Court heard evidence that Ross gained Hodge's confidence and acted to purchase a home on Hodge's behalf. The court also heard evidence that Hodge asked Ross to purchase the property on his behalf because she possessed experience purchasing real estate, Hodge had limited knowledge regarding the purchase of real estate, and Hodge could not read. If the Superior Court found this evidence to be credible, and it obviously did, then it properly concluded that a confidential relationship existed. Therefore, although the Superior Court heard vastly different accounts of how and why the property was purchased, based on the evidence before it, we cannot say that the court clearly erred by finding that Ross convinced Hodge that she could be trusted to complete the "purchase transaction" for the property by claiming to be knowledgeable and experience in real estate transactions. *See Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 200 (3d Cir. 1995) (explaining that when an appellate court reviews a trial court's findings of fact it must give "all due deference to the opportunity of the trial judge to evaluate the credibility of witnesses and to weigh the evidence") (internal quotations marks and citations omitted).

---

[15] In determining whether a confidential relationship exists "[a] court may consider a variety of factors, including the reliance of one party upon the other, the relationship of the parties prior to the challenged transaction, the relative business capacities or lack thereof between the parties, and the readiness of one party to follow the other's guidance in complicated transactions." *Constructive Trust Formed Because of Abuse of Confidential Relationship Between Tranferee and Transferor of Property*, 79 AM. JUR. PROOF OF FACTS 3D 269 § 13 (West 2011).

Similarly, based on these findings of fact, we cannot say that the court erred by finding that a confidential relationship existed between Ross and Hodge wherein Ross was the dominant party and Hodge was the servient party.

██ Nevertheless, "[t]he existence of a confidential relationship does not automatically give rise to the imposition of a constructive trust." *Francois*, 599 F.2d at 1292. "Rather, 'its effect is simply to impose a burden upon the party benefiting from the transaction of proving that he took no unfair advantage of his relationship with the other.' " *Id.* (quoting *Stauffer v. Stauffer*, 465 Pa. 558, 351 A.2d 236, 242 (1976)). However, if the party benefitting from the transaction cannot show, by clear and convincing evidence, the absence of undue influence, a constructive trust will be imposed to prevent unjust enrichment. *Francois*, 599 F.2d at 1292-93. In determining whether a transaction is free from undue influence the Restatement (Second) of Contracts instructs courts to analyze multiple factors, including "the unfairness of the resulting bargain, the unavailability of independent advice, and the susceptibility of the person persuaded . . . ." RESTATEMENT (SECOND) OF CONTRACTS § 177 cmt. b (1981); *see also Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 976 (V.I. 2011) (explaining that although 1 V.I.C. § 4 does not incorporate all of the Restatement provisions as if they were actual statutory text, those provisions are nevertheless persuasive authority).

██ In this case, the Superior Court concluded that "[b]ecause Hodge was illiterate, he was extremely susceptible to Ross' influence" and that Ross "overcame Hodge's will . . . and unduly influenced him in the handling of . . . No. 25 Estate Mahogany Welcome to secure her own personal advantages." (J.A. vol. I, 10.) Specifically, the court determined that "Ross deliberately misrepresented/misled him into believing that his signature on the quitclaim deed was needed for her to acquire a small loan . . . when in actuality his signature on the document effectuated a transfer to Ross of his interest in . . . No. 25 Estate Mahogany Welcome." (J.A. vol. I, 10.) In arriving at this conclusion, the court did not expressly analyze the evidence to determine whether Ross and Bracy were able to overcome the presumption that Ross unduly influenced Hodge. Regardless, based on the evidence presented at trial and the Superior Court's interpretation of that evidence, we conclude that Ross failed to overcome the presumption that she unduly influenced Hodge into both

purchasing the home as a tenant in common and transferring his interest in the property to Ross.

With regard to the initial purchase of the home, based on the court's conclusion that Hodge asked Bracy and Ross to purchase the home in the name of one of his companies, which is supported by Hodge's testimony, the fact that Ross and Bracy secretly placed their names on the deed renders the transaction patently unfair. In an attempt to demonstrate the fairness of the transaction, Ross points to evidence that Hodge "operates and has a significant ownership interest in at least three local companies," "signed his name . . . on the Offer to Purchase" and other documents associated with the purchase, and "signed all the documents in his individual capacity without any reference to [one of his companies]." (Appellants' Br. 16.) This does not constitute clear and convincing evidence that Hodge intended to purchase the property as a tenant in common with Bracy and Ross. Accordingly, the presumption that Ross unduly influenced Hodge into purchasing the property was not overcome.

Similarly, with regard to the transfer of Hodge's interest in the home to Ross, based on the court's conclusion that Hodge could not read and believed that the documents he signed were for Ross to take out a loan against the property, which is supported by Hodge's testimony, the transfer was unfair. Further, Hodge did not have any independent advice prior to signing the document, and the court found Hodge to be extremely susceptible to undue influence because of his illiteracy. On the other hand, Ross presented evidence that Hodge could read and that Ross informed Hodge that the documents he was signing were to transfer his interest in No. 25 Mahogany Welcome to her. Although that evidence does cast some doubt upon the Superior Court's conclusion that Ross unduly influenced Hodge, it is not clear and convincing evidence sufficient to overcome the presumption of undue influence.[16] Accordingly, the Superior Court did

---

[16] As noted by the dissent, in *Martin v. Martin*, 54 V.I. 379 (V.I. 2010), this Court rejected the proposition that "a party can seek relief under a theory of unjust enrichment for property he has quitclaimed to another under fraudulent circumstances." *Id.* at 396. There the Court distinguished *Francois*, noting that it was inapposite primarily because undue influence was not alleged. *Id.* at 396 n.7. But in this case undue influence was alleged, an allegation the Superior Court found credible. Additionally, we held in *Martin* that the unjust enrichment claim failed because there was no evidence offered at trial indicating that a benefit was conferred and accepted under circumstances that would make retention of that benefit unjust. *Id.* at 396. However, in the case now before us — as outlined above — substantial evidence was pre-

not err in finding that Ross exerted undue influence over Hodge to acquire No. 25 Mahogany Welcome or that Ross was unjustly enriched at Hodge's expense.

## 2. The Superior Court erred by granting Hodge an equitable lien in property owned by Ross.

The Appellants next argue that the Superior Court erred by granting Hodge an equitable lien in property owned by Ross because that property has no connection to Hodge or the property the Appellants allegedly acquired through undue influence. The Appellants also claim that the Superior Court erroneously awarded Hodge an equitable remedy when there was other appropriate relief available, namely the monetary damages awarded to him by the jury.[17]

 The Superior Court granted Hodge an equitable lien in Ross' property located at No. 110 Estate Work and Rest. To arrive at this award, the court explained that because Ross unduly influenced Hodge into transferring No. 25 Mahogany Welcome to her, she did not own that property, but rather held it in a constructive trust for Hodge. However, that trust terminated when Ross sold No. 25 Mahogany Welcome to a bona fide purchaser for value. See RESTATEMENT OF RESTITUTION § 168(1) (1937) ("Where a person holding property in which another has a beneficial interest transfers title to the property in violation of his duty to the other, the transferee holds the property subject to the interest of the other, *unless he is a bona fide purchaser.*" (emphasis added)). *See also Istel v. Istel*, 258 A.D.2d 506, 684 N.Y.S.2d 620, 621 (N.Y. App. Div. 1999) ("A bona fide purchaser of property upon which a constructive trust would otherwise be imposed takes free of the constructive trust . . . ." (citation omitted)). Accordingly, the Superior Court relied on the

---

sented at trial establishing the unjust retention of a benefit by Ross, making this case more analogous to *Francois* than *Martin*. Since the trial court's findings support the conclusion that Hodge conferred a benefit upon Ross, that she accepted, under circumstances that would make it unjust for her to retain that benefit, and since we nonetheless set aside the equitable lien and monetary judgment afforded Hodge, we decline to find that the trial court erred in basing its decision on unjust enrichment rather than misrepresentation and fraud.

[17] Because we agree with the Appellants' first claim, we do not reach the question of whether the Superior Court erroneously awarded Hodge an equitable remedy when there was other appropriate relief available.

RESTATEMENT OF RESTITUTION § 161[18] to award Hodge an equitable lien on property owned exclusively by Ross, namely, No. 110 Work and Rest.

 Under the Restatement of Restitution, in certain situations, a court may impose either an equitable lien or a constructive trust upon the property of a defendant. RESTATEMENT OF RESTITUTION § 161 cmt. a (1937). However,

> [a]n equitable lien can be established and enforced only if there is some property which is subject to the lien. Where property is subject to an equitable lien and the owner of the property disposes of it and acquires other property in exchange, he holds the property so acquired subject to the lien, in accordance with the rules stated in §§ 202-215 (Chapter 13).

*Id.* § 161 cmt. e. In turn, Section 215(1) states that "where a person wrongfully disposes of the property of another but the property cannot be traced into any product, the other merely has a personal claim against the wrongdoer and cannot enforce a constructive trust or lien upon any part of the wrongdoer's property."

 In this case, if Ross had not sold No. 25 Mahogany Welcome, the Superior Court could have placed an equitable lien upon it. However, after Ross sold No. 25 Mahogany Welcome, the only way the court could have placed an equitable lien upon No. 110 Work and Rest is if it traced the proceeds of the sale of No. 25 Mahogany Welcome to No. 110 Work and Rest. Simply put, there is no evidence that links the proceeds of the sale of No. 25 Mahogany Welcome to the purchase, maintenance, or upgrade of No. 110 Work and Rest.[19] Ross testified that she sold No. 25 Mahogany Welcome in 2002 for approximately $103,000. After paying off the mortgage she had taken out on No. 25 Mahogany Welcome in June of 2000, Ross was left with approximately $28,000. She testified that she put that money into a joint account she shared with Bracy and used it for daily expenses. Ross also expressly stated that not a penny was used from

---

[18] RESTATEMENT OF RESTITUTION § 161 (1937) states "[w]here property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien arises."

[19] In fact, the Superior Court did not perform any type of tracing analysis in making its conclusions of law and failed to mention any connection between the proceeds from the sale of No. 25 Mahogany Welcome and No. 110 Work and Rest.

that joint account to do any repairs on No. 110 Work and Rest, because those repairs were completed in 2001. Hodge offered no evidence to contradict this testimony. Absent any evidence upon which the Superior Court could have traced the proceeds from the sale of No. 25 Mahogany Welcome to No. 110 Work and Rest, we conclude that the Superior Court erred in granting Hodge an equitable lien on that property.

### 3. The Superior Court erred by denying the Appellants' motion for a directed verdict on Hodge's conversion claim.

The Appellants next argue that the Superior Court erred by denying their motion for a directed verdict on the conversion count during the jury trial, because the record does not "reasonably demonstrate that the Appellants unlawfully converted proceeds due to [Hodge] from the sale of [No.] 25 Mahogany Welcome . . . ." (Appellants' Br. 22.) Specifically, the Appellants claim that "[t]here was absolutely no documentary evidence . . . from which it could be reasonably inferred that Ross converted the personal property of Hodge for her own use." (Appellants' Br. 22.)

"Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." RESTATEMENT (SECOND) OF TORTS § 222A(1) (1965). Conversion may be committed by intentionally engaging in several types of acts, one of which is obtaining possession of a chattel from another by fraud. *See id.* §§ 221(b), 223. Here, the evidence demonstrates that Ross and Bracy intentionally exercised control of the proceeds from the sale of No. 25 Mahogany Welcome and that interference, if wrongful, would certainly require them to pay Hodge the full value of the chattel. Therefore, the critical question is whether Ross and Bracy had a right to control those proceeds at the time of the conversion. *See Grand Pac. Fin. Corp. v. Brauer*, 57 Mass. App. Ct. 407, 783 N.E.2d 849, 857 (2003) ("The elements of conversion require that a defendant be proved to have 'intentionally or wrongfully exercise[d] acts of ownership, control or dominion over personal property to which he has no right of possession at the time . . . .' " (citation omitted)). *See also Zimmerman v. FirsTier Bank*, N.A., 255 Neb. 410, 585 N.W.2d 445, 451-52 (1998) ("The plaintiff must establish a right to immediate possession of the property at the time of the alleged conversion." (citation

308

omitted)); *Bradford v. Dumond*, 675 A.2d 957, 962 (Me. 1996) ("The Plaintiff must show (1) a property interest in the goods; [and] (2) the right to their possession at the time of the alleged conversion . . . ." (internal quotation marks and quotations omitted)).

 At trial the Superior Court heard evidence that Hodge quitclaimed his interest in No. 25 Mahogany Welcome to Ross in 2000 and that Ross sold No. 25 Mahogany Welcome in 2002. Once Hodge quitclaimed his interest in the real property to Ross, he lost his ownership interest in the real property and any accompanying right to possess or exert control over the real property or any proceeds from the sale of that real property. Because Hodge had no right to possess or control No. 25 Mahogany Welcome at the time Ross sold it, Hodge had no property with which Ross could have interfered so as to constitute a conversion. Hodge presented no evidence to contradict this conclusion. Instead, Hodge presented evidence that Ross and Hodge initially obtained a 2/3 interest in No. 25 Mahogany Welcome by fraud or undue influence and that Ross subsequently acquired Hodge's 1/3 interest in the property by fraud or undue influence. This evidence supports Hodge's claims for fraud, which the jury ultimately denied, and unjust enrichment, which the court ultimately granted, but it does not indicate that Ross actually owned or had any right to possess the real property at the time Ross sold it.[20] Therefore, even when viewing the evidence in the light most favorable to Hodge, we cannot conclude that the record contains sufficient evidence from which a jury could reasonably find Ross and Bracy guilty of conversion. Accordingly, the Superior Court erred when it denied the Appellants' motion for a directed verdict in the jury trial.

---

[20] If the Court were to conclude that an individual committed conversion by fraudulently obtaining real property, selling the real property, and collecting the proceeds, it would effectively overrule the well-established rule that real property is not subject to conversion. *See Strawberry Water Co. v. Paulsen*, 220 Ariz. 401, 207 P.3d 654, 659 (Ariz. Ct. App. 2008) (explaining that interests in real property cannot be converted, because they are not chattels); *Roemer and Featherstonhaugh P.C. v. Featherstonhaugh*, 267 A.D.2d 697, 699 N.Y.S.2d 603, 604 (N.Y. App. Div. 1999) (explaining that real property cannot be converted); *Pierson v. GFH Financial Services Corp.*, 829 S.W.2d 311, 314 (Tex. App. 1992) (same).

**4. The Superior Court abused its discretion by dismissing Bracy's counterclaim against Nathalie Hodge without considering whether good cause existed to grant Bracy an extension to serve Nathalie Hodge or, in the absence of good cause, whether such an extension was nevertheless warranted.**

The Appellants next argue that the Superior Court erred by entering an order on February 5, 2010, which dismissed Bracy's counterclaim against Nathalie Hodge on the grounds that Bracy never served Nathalie Hodge with his counterclaim. The Appellants do not argue that Bracy actually served Nathalie, but instead rely on Nathalie's presence at a status conference on December 15, 2005. Specifically, the Appellants claim that Hodge knew that there was an action against her because she appeared at the status conference regarding Bracy's counterclaim against her and her father and because the Superior Court entered an order following that status conference which granted Bracy's "Motion for Leave to File a Counterclaim and to join Nathalie Hodge as a Defendant" and deemed that counterclaim as " 'filed and *served*' " as of the date of the conference.[21] (Appellants' Br. 24 (quoting J.A. vol. VI, 1943).)

In general, actual notice of a law suit is not a substitute for proper service and absent proper service, a case must be dismissed for lack of personal jurisdiction over the defendant. *See Friedman v. Estate of Presser*, 929 F.2d 1151, 1155-56 (6th Cir. 1991). However, before a court may dismiss a complaint against a party for lack of service, it must consider whether good cause exists to extend the 120 day time limit for service. *See* FED. R. CIV. P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court — on motion or on its own after notice to the plaintiff — must dismiss the action without prejudice against the defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."). Even if the court finds that

---

[21] The Superior Court later clarified that its order deeming the counterclaim filed and served applied only to Harold Hodge, and not Nathalie Hodge, because Nathalie Hodge was not represented by counsel at the status conference. The court explained that although Martial Webster originally represented Nathalie Hodge in response to an earlier counterclaim filed by Bracy, that counterclaim had been dismissed. Because the only claim against Nathalie Hodge had been dismissed, the court concluded that Webster's representation of Nathalie Hodge ended and therefore its order could not have applied to her, regardless of her presence at the status conference.

no good cause exists to warrant an extension, the court must at least consider whether any other factors warrant a discretionary extension. *See Beachside Assocs., LLC v. Fishman*, 53 V.I. 700, 717-18 (V.I. 2010). In this case, the Superior Court failed to consider whether good cause or any other factors warranted granting Bracy an extension of time to serve Nathalie Hodge. By dismissing Bracy's counterclaim without properly analyzing whether an extension was warranted, the Superior Court abused its discretion.[22] *See id.* at 719.

### 5. The Superior Court did not err by preventing the jury from considering certain portions of the Professional Services Agreement.

The Appellants last argue that the Superior Court erred by excluding certain portions of the PSA. Specifically, the Appellants argue that the Superior Court's decision that "the projects on the agreement relating to Harry Hodge II and Nathalie Hodge could not be considered by the jury because Nathalie Hodge was removed as a [party to the lawsuit] completely contravenes [the] legal principle of joint and several liability." (Appellants' Br. 25.)

 Quite simply, the Appellants' contention that the Superior Court prevented the jury from considering the projects in the PSA relating to Harry Hodge II and Nathalie Hodge, because Nathalie Hodge was removed as a counter defendant, is wrong. The Superior Court prevented

---

[22] We note that the Superior Court raised the issue of service of Bracy's counterclaim on Nathalie Hodge *sua sponte* shortly before trial. In its February 5, 2010 Order, the court found that Nathalie was not served and that her appearance at a status conference was insufficient to establish personal jurisdiction over her. The court then explained that "proper service of process on a party is a 'jurisdictional' issue." (J.A. vol. VI, 1946.) While the court is correct that "service of process — *unless waived by a general appearance* — is a prerequisite to the Superior Court obtaining personal jurisdiction over a defendant," *Joseph v. Daily News Pub. Co., Inc.*, S. Ct. Civ. No. 2009-0015, 57 V.I. 566, 2012 V.I. Supreme LEXIS 80, *15 n.4 (V.I. Oct. 31, 2012) (citations omitted) (emphasis added), the court never considered whether Nathalie had waived the defenses of insufficient service of process or lack of personal jurisdiction. *See* FED. R. CIV. P. 12(h)(1). In addition to her appearance at the status conference, at multiple points during her deposition, Bracy's attorney explained to Nathalie that they were deposing her because she was made a party to the lawsuit through Bracy's counterclaim. Accordingly, on remand the court should also consider whether Nathalie Hodge waived the defenses of insufficient service of process or lack of personal jurisdiction by voluntarily appearing and participating in the litigation. *See* 5 V.I.C. § 115 ("A voluntary appearance of the [counterclaim] defendant shall be equivalent to personal service of the summons upon him.").

the jury from considering contracts 3, 4, 5, and 7, because Bracy testified that Hodge recovered no money on these contracts. Because Hodge recovered no money on those contracts, Bracy's percentage of those contracts was zero and Hodge owed him no money for those contracts. Furthermore, Bracy and Hodge consented to redacting those projects from the PSA. The court let the jury consider all the other projects. Accordingly, the Superior Court did not err in preventing the jury from considering certain portions of the PSA.

## IV. CONCLUSION

For the reasons described above, the judgment appealed from is affirmed in part and reversed in part. The portion of the judgment finding that Ross was unjustly enriched at Hodge's expense is affirmed. As set forth above, we reverse the Superior Court's August 6, 2010 Decree, August 12, 2010 Judgment, and February 5, 2010 Order, and remand the matter to the Superior Court for further proceedings consistent with this opinion, including the entry of a new judgment affording a remedy on Hodge's unjust enrichment claim upheld in this appeal.

## DISSENTING OPINION

HODGE, *Chief Justice*, concurring in part and dissenting in part.

I agree with the majority's conclusion that the Superior Court erred when it entered an equitable lien on Ross's property, when it declined to grant Appellants' motion for directed verdict on Appellee's conversion claim, and when it dismissed Appellants' counterclaim. I write separately because I believe the trial court also erred when it found that the purchase of the subject property was the result of undue influence.

The trial court found that Ross and Bracy enjoyed a confidential relationship with Hodge. I do not find that it is necessary to reach that question because, even if there was a confidential relationship, the court's findings do not support a conclusion that the purchase of the No. 25 Mahogany Welcome property was the result of undue influence.

"Undue influence" is defined as "excessive and unfair persuasion, sufficient to overcome the free will of the transferor." RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 15(1). If a person obtains a transfer because of this undue influence, "[t]he transferee is liable in restitution as necessary to avoid unjust enrichment." *Id.* at § 15(2). The relevant act here is the *persuasion*, which, when done in an

excessive and unfair manner, renders the result unjust. *Francois v. Francois*, 599 F.2d 1286, 1292, 16 V.I. 130 (3d Cir. 1979) ("The essence of the idea [of undue influence] is the subversion of another person's will in order to obtain assent to an agreement."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 177 cmt. b (noting that the courts, when analyzing an undue influence claim, should consider, *inter alia*, the "susceptibility of the person *persuaded*") (emphasis added).

Here, the trial court never made any factual findings to support a conclusion that Hodge's will was overcome, or that he signed over his interest in No. 25 Mahogany Welcome because he was persuaded to do so against his better judgment. Instead, the trial court made findings sounding in fraudulent inducement. It determined that "Ross deliberately misrepresented/misled [Hodge] into believing that his signature on the quitclaim deed was needed for her to acquire a small loan . . . when in actuality his signature on the document effectuated a transfer to Ross of his interest in [No. 25 Estate Mahogany Welcome]." (J.A. 10.) Thus, the trial court characterized the transfer as one resulting from misrepresentation and fraud, and not as a transfer that Hodge agreed to because his will had been unfairly overborne, or because he had otherwise suffered from "excessive and unfair persuasion." RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 15(1). The evidence cited by the court supports a conclusion not that Hodge was unfairly persuaded, but, instead, was misled or lied to.[1]

In *Martin v. Martin*, 54 V.I. 379, 396 (V.I. 2010), this Court made clear that a party cannot seek restitution under an unjust enrichment theory — such as one involving a transfer within a confidential relationship — "for property he has quitclaimed to another under fraudulent circumstances." If a party engaging in fraud wrongfully procures the signature of another

---

[1] The evidence cited by the majority likewise supports a fraud claim, but not an "undue influence" finding. For example, it states that "Ross and Bracy *secretly* placed their names on the deed," (Op. at 12) (emphasis added), and that Hodge "believed that the documents he signed were for Ross to take out a loan." (Op. at 13.) This evidence perhaps supports a finding that Hodge was lied to and misled, but not that his will was overborne by excessive persuasion.

on a document, then the claimant must proceed under a theory of fraud and cannot succeed on an unjust enrichment theory.[2]

Because the trial court's findings do not support an "undue influence" theory, I would find that the court's conclusion that the transfer was the result of such influence bore "no rational relationship" to those findings, and so would reverse the trial court's unjust enrichment finding. *Martin*, 54 V.I. at 396 (deciding that the fact that a person who could not read was fraudulently induced into signing a deed could not support an unjust enrichment theory, but instead must relate — if at all — to a claim for fraud). For these reasons, while I concur with the majority's conclusion that the trial court erred in imposing an equitable lien, in declining to grant Appellants' motion for a directed verdict on the conversion claim, and in dismissing Appellants' counterclaim, I respectfully dissent from the Court's affirmance of the trial court's undue influence findings.

---

[2] It might be argued that such a distinction is meaningless because it focuses on the name of the claim (i.e., "fraud" versus "undue influence"). However, claims for fraud — unlike actions for restitution based on "undue influence" — must be pleaded with particularity. FED. R. CIV. P. 9(b); *see also* SUPER. CT. R. 7 (applying the Federal Rules of Civil Procedure whenever not inconsistent with a Superior Court Rule). And more significantly for this case, a fraud claim had already been argued to the jury and the jury decided against Appellees on that claim. To rule otherwise would be to permit a litigant to pursue both fraud and undue influence claims on the chance that if the jury decided against the plaintiff on the fraud claim, the court itself might enter a judgment on the undue influence claim based on the same evidence. This would result in inconsistent findings, and would be patently unfair to defendants, giving plaintiffs a second bite at the apple after defendants successfully persuaded a jury to find that there had been no fraud.