**RENALDO PENN, Appellant/Defendant**
**v.**
**LISA MOSLEY, Appellee/Plaintiff**

S. Ct. Civil No. 2016-0061

Supreme Court of the Virgin Islands

August 11, 2017

JUDITH L. BOURNE, ESQ., St. Thomas, USVI, *Attorney for Appellant.*

LISA MOSLEY, Bronx, NY, *Pro se.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

### (August 11, 2017)

SWAN, *Associate Justice.* Appellant, Renaldo Penn, requests that we reverse an order of the Appellate Division of the Superior Court of the Virgin Islands ("Appellate Division") affirming a judgment of the Magistrate Division of the Superior Court ("Magistrate Division") that found Penn liable to Appellee, Lisa Mosley, in the amount of $10,000 plus court costs. Because the findings of fact support the judgment of the Magistrate Division, we conclude that the Appellate Division correctly affirmed the judgment of the Magistrate Division, and we likewise affirm the September 8, 2016 order of the Appellate Division.

## I. FACTS AND PROCEDURAL HISTORY

On January 28, 2015, Mosley filed a Small Claims case in the Magistrate Division of the Superior Court of the Virgin Islands, case number ST-15-SM-23. In the complaint, Mosley asserted a claim against Penn for $10,000. Mosley averred that she had begun working for Penn on January 23, 2013, when she received a deposit of $500 in order for her to design his business logo and website content and to take product photographs. At that time, Mosley was living in New York, and, according to Mosley, Penn requested that she join him as a partner in a business venture that would be called Rudy's Delight. Mosley demanded, and Penn agreed to 1) provide her an airline ticket for travel from New York to St. Thomas; 2) Mosley's "own personal SUV"; 3) office space and housing in his two-bedroom home; 4) cook daily, with Mosley assisting by providing funds for the purchase of food; and 5) convert the business into an appropriate business organization.

Mosley further alleged that she had provided the services as agreed, but Penn had failed to provide the promised SUV. In December of 2014, she and Penn then agreed that Penn would pay her $1,000 monthly in lieu of providing the vehicle. As their business relationship began to deteriorate, Penn became violent with Mosley. Therefore, Mosley asked Penn to execute a "Roles, Responsibilities and Agreement" on January 9, 2015, memorializing their prior oral contract. She admitted that she had taken $1,440 from the business bank account as of the filing of the Small Claims complaint.

Penn filed a counterclaim on February 24, 2015, in which he asserted that Mosley was his ex-girlfriend with whom he had been living, and she had taken several of Penn's belongings and paraphernalia when she vacated their apartment. These belongings included Penn's passport, birth certificate, the certificate of title to his vehicle, his business records necessary for him to prepare his 2014 income tax return, and other business files in addition to a router, chest freezer, scanner/copier, a blender, and a set of keys to his vehicle, apartment, and mailbox. In his answer, Penn counterclaimed for $10,000.

The Magistrate Division held a Small Claims hearing on April 14, 2015. Mosley testified that she and Penn began communicating via email and social media in 2012 because Penn wanted to start his own business and needed assistance with branding and marketing. Upon receipt of a

$500 payment, she began work for Penn while she was in New York. The parties negotiated for a year, and after a year of online interactions, Mosley agreed to return to St. Thomas to be business partners with Penn and to create a brand for the business. As a condition of Mosley's return to St. Thomas, Penn agreed to purchase Mosley her own vehicle — an SUV — in lieu of monetary compensation for her work in developing Penn's business. When Mosley arrived at the St. Thomas airport on April 4, 2013, however, Penn transported her in a truck. When Mosley asked about her SUV, Penn informed her that he could not afford another car and that the truck was too good a deal to pass up. Nevertheless, Mosley began work establishing Penn's business because Penn promised that he would purchase the SUV for her once the business began flourishing. Importantly, Penn performed all other conditions of their agreement.

Operations commenced with Penn heading the production and Mosley dealing primarily with administrative needs. On January 9, 2015, Mosley and Penn executed an agreement outlining their business arrangement. Mosley provided a copy of this agreement to the court. Penn was asked if he had any objection to its admission in evidence. He objected, asserting that he did not remember signing the agreement, but he admitted that the signature on the document "surely looks like my signature." Over his objection, the trial court admitted the exhibit. The parties' agreement was one page and stated that the purpose of the agreement was to acknowledge the business relationship between the parties in the future. The agreement further stated the following:

1. Penn would tender to Mosley $125 weekly in order that she could continue paying his monthly home and business expenses;

2. Penn acknowledged that Mosley was a signatory on both his business and personal accounts in order to handle the administrative necessities of the business and his personal expenses;

3. Penn agreed to pay Mosley $1,000 monthly commencing in December 2014 in order to allow her to purchase the vehicle he had promised;

4. Penn acknowledge[d] that, despite Mosley's name not being listed on any bank accounts or business documents, she was a 50% owner of the business;

884

5. Penn acknowledged that, in April 2013, he had promised to purchase a vehicle for Mosley titled in her name and that he later promised to purchase that same vehicle in 2015; and

6. Penn promised to pay Mosley a total of $12,000, which included the value of the vehicle Penn had failed to purchase for Mosley.

Mosley also provided a copy of the "Addendum to Deposit Accounts Agreement" to verify that she was a signatory on the business's bank account. In proving her damages, Mosley stated that she was seeking $10,000 for the work she had done for the business or, alternatively, the vehicle Penn promised but never delivered. Mosley provided a pay scale for administrative assistants to support her claim for her hourly rate, which was admitted without objection by Penn. Penn objected to Exhibit 4, a statement of work completed by Mosley, contending that he did not believe it reflected the correct dates. The court admitted the document. Mosley billed the business at $10.36 an hour for five hours a day working five days a week. From April 2013 to January of 2014, Mosley's compensation for work performed amounted to $9,945.60. She explained that she continued to do business with Penn despite his failure to provide the vehicle as promised because he assured her it would be provided once the business was up and running. She ceased doing business with Penn in June of 2015. Mosley admitted to receiving $1,720 in emolument.

Cleve Stridiron testified that he had a phone conversation with Penn in January of 2015 in which Penn admitted that he owed Mosley a vehicle as compensation for her contribution to the business. Stridiron also testified that Mosley and Penn were roommates with Penn occupying the bedroom, and Mosley having a bed in the living room where she slept.

Penn then presented his case. Penn testified that he and Mosley met via social media in 2012, and they began communicating regularly. This contact led to discussion of Mosley returning to St. Thomas. Penn ultimately offered to purchase her a plane ticket to return to St. Thomas. However, they first discussed living arrangements, and she requested that he make certain improvements to the premises where he resided in order to accommodate her. Penn maintained that these discussions were not business related, and they were not discussing doing business together when he spoke of his business and wanting her to return to St. Thomas. He explained that he had promised to purchase a vehicle for their joint

use, but instead purchased a truck, for which Mosley had a set of keys so she could utilize it.

Penn further asserted that it was only after an intimate connection had been established that they discussed doing business together, though there was no agreement regarding the terms of the business dealings. Penn contradicted Mosley's testimony stating that he was working on the business while she was getting "settled in" to her new life on St. Thomas. Penn asserted that Mosley first began helping with his family's business when she returned to St. Thomas. He also contradicted Mosley, testifying that she did not assist with his family's business until shortly before their relationship deteriorated.

Penn admitted that Mosley assisted in developing his business's website and that he agreed to allow her to live in his home, so long as she assisted him with paying his bills. Penn also testified that he had paid Mosley at least $1,000 toward developing logos, labels, and similar things for his family's business. Penn explained that Mosley did the majority of the paperwork and other administrative work for the business while he handled the physical work.

When asked if he signed the January 9, 2015 agreement, Penn stated that it looked like his signature but that it was not because he would not have agreed to what was enumerated in the document, explaining that the two were fighting at the time, and he was frustrated with her.

When questioned by Mosley, Penn stated that Mosley had provided a business proposal regarding his family's business in December of 2012. He maintained, however, that he sent pastries and baked goods to Mosley in New York, not for purposes of photographing the products to advertise on the family's business website, but because Mosley wanted them for personal consumption. When Mosley further questioned Penn as to whether they had a verbal agreement prior to her returning to St. Thomas, he admitted that they "may have." Penn further admitted that they had begun a business venture selling lighters online prior to Mosley returning to St. Thomas.

Presenting his counterclaim, Penn asserted that Mosley took his file cabinet, his chest freezer, a blender, his business logos and labels, his passport, his birth certificate, his truck's certificate of title, plastic bags for his business, the TV remote control, and a router. The magistrate asked Penn the basis for his belief that Mosley took these things. Penn explained that certain items of his personal property were in his home on January

886

13, 2015, when he went to the hospital and left Mosley there to move out, but that the same items of personal property were gone when he returned.[1] Cross-examining Penn, Mosley elicited her version of the facts that indicated that she had reimbursed Penn for the blender and the chest freezer. Mosley also maintained that she "did not take any receipts out of [Penn's] house except for the things that [she] paid for." Penn countered that Mosley did not pay for these items.

Officer Nigel John testified that, while not remembering the specific day, in January of 2015, he was dispatched to Penn's residence where Penn and Mosley resided "as roommates." Penn informed Officer John that Mosley had taken his personal property. Mosley informed Officer John that she had nothing belonging to Penn. Officer John verified that Penn was at the hospital while Mosley removed her belongings from Penn's home. Officer John could not recall seeing, either in Penn's home or in the truck Mosley used to transport her belongings that night, any of the items Penn claimed Mosley had taken.

Penn's sister, Cheril Penn, testified next. She stated that, when she met Mosley for the first time, Mosley discussed different types of promotions for C. Penn's business and was introduced by Penn as his "friend." The magistrate then asked C. Penn if she recalled the contents of Penn's apartment, but she did not testify regarding the personal items Penn claimed Mosley had removed from the apartment.

The magistrate then made findings of fact and adjudicated the case. The magistrate found that the parties began communicating online in 2012 when Mosley lived in New York and Penn lived on St. Thomas. In their conversations, Penn informed Mosley that he wished to start a retail bakery business. Mosley has a background in business branding and administration. Therefore, Penn asked her to return to St. Thomas to be his business partner. The magistrate found that Penn acknowledged the purchase of the airline ticket for Mosley. The magistrate also concluded that, during these conversations and prior to his purchasing the ticket for Mosley to return to St. Thomas, Penn and Mosley discussed Penn's

---

[1] On this night, Penn and Stridiron, Mosley's business associate and friend, got into a physical altercation, and the police responded to the incident. Penn requested he be taken to the hospital. At that time, the officer advised Mosley to vacate Penn's residence, and she did so immediately.

family's business and the prospects of Penn establishing his own business.

The magistrate further found that, as a precondition to Mosley returning to St. Thomas, Mosley required that Penn supply a vehicle and provide a place where she could reside and work because Penn lacked the funds to pay Mosley a salary. The magistrate noted that Penn contradicted this contention when Penn stated that he had agreed that he would purchase a vehicle for their joint use. Upon returning to St. Thomas, Mosley resided at Penn's residence and began establishing the business by opening accounts to which they both had access and performing other administrative tasks. Mosley did this work from April 2013 to December 2014 without pay. In January of 2015, Penn removed Mosley's name from the accounts. None of the witnesses who testified had personal knowledge of the extent of the relationship between Penn and Mosley. Stridiron testified that Mosley did work for his business similar to the work she had completed for Penn.

As to Exhibit 1, the agreement dated January 9, 2015, the court found that it was prepared by Mosley and signed by both parties in order to confirm in writing the terms of the oral business agreement. This contract specifically enumerated Penn's obligation to pay Mosley $1,000 monthly, commencing in December of 2014.

The magistrate concluded that the evidence supported Mosley's claim by a preponderance of the evidence; therefore, the court adjudged that Mosley was entitled to $10,280, of which the court could only award $10,000 due to its jurisdictional limits.

With regards to Penn's counterclaim seeking to recover the value of the missing personal property, the court acknowledged that the party seeking affirmative relief must establish the claim by a preponderance of the evidence, which required Penn to prove that Mosley removed the items from the apartment and that the value of those items was $10,000. In support of his claim, Penn produced three (3) receipts totaling $814.69. Mosley produced contradictory evidence, confirming that she had reimbursed Penn $714.69 for two items purchased by Penn on Mosley's behalf. The magistrate determined that Penn failed to prove that Mosley caused the loss of the post office box key and consequently cost him the $24 key replacement fee.

The magistrate specifically determined that Mosley was more credible than Penn and cited a general lack of certainty in Penn's testimony while

contrasting Penn's testimony to that of Mosley who "was straight forward in her testimony" and had her testimony corroborated with other evidence. On May 26, 2015, a judgment was entered in favor of Mosley for $10,000 with post judgment interest of 4% annually plus court costs and dismissing Penn's counterclaim with prejudice.

On May 29, 2015, Penn filed a petition for internal review in the Appellate Division of the Superior Court of the Virgin Islands seeking review "of all issues decided" in the Magistrate Division. In his brief to the Appellate Division, Penn presented three issues for consideration.

First, Penn argued that there was no credible basis for concluding there was a valid contract between him and Mosley. Penn advanced three contentions. First, he argued that, assuming the terms of the contract were as found by the Magistrate Division, only $3,000 was due at the time of the trial. Second, he argued that the "document" was not valid due to a lack of consideration. Third, he argued that there was "a strong basis for skepticism with regard to the authenticity of Mr. Penn's purported signature[.]" As the basis for the challenge to the authenticity of Penn's signature, he advanced that 1) the terms of the agreement are favorable to Mosley, 2) the document is dated three days after the January 6, 2015 assault, which would have signaled to Mosley that her relationship with Penn was ending, 3) the document was signed three days after Penn removed Mosley as a signatory on the bank accounts, 4) four days after the document was signed, Penn and Stridiron had an altercation because Penn had accused Mosley of stealing his keys, 5) Mosley is skilled in using a computer for manipulation of graphics and had access to all of Penn's documents, enabling her to electronically forge Penn's signature, and 6) there was no business reason for Penn to sign the document.

The Appellate Division concluded that the Magistrate Division had articulated adequate factual findings to support the conclusion that Mosley and Penn operated under an oral contract from the time they agreed to the terms upon which Mosley would return to St. Thomas. Penn had offered to purchase a ticket for Mosley to return to St. Thomas because he wanted to begin a business, and Mosley accepted this offer by moving to St. Thomas and commencing work establishing Penn's business. Citing the above facts and the Magistrate Division's determination that Mosley was the more credible of the two, the Appellate

889

Division concluded that the evidence was adequate to support Mosley's breach of contract claim and the damages.[2]

Second, Penn argued that the factual finding as to the nature of Penn and Mosley's relationship, being that of a business partnership, was against the weight of the evidence. While Penn cites to numerous areas of his testimony that were in contradiction to Mosley's, the crux of his position can be summed up with the following argument presented in Penn's brief to the Appellate Division, "Looked at as the breakup of an intimate relationship, the 'evidence' for a $10,000 debt does not come near to being preponderant." The Appellate Division determined that these arguments were Penn in reality "challenging the Magistrate's credibility determinations[.]"

Finally, Penn argued that the Magistrate Division incorrectly allocated the burden of proof. Citing *Ross v. Hodge*, 58 V.I. 292 (V.I. 2013), Penn asserted that the testimony of the parties showed that "Mosley had complete access to, and, in fact, controlled, Mr. Penn's finances" establishing that the two were in a confidential relationship. Therefore, it was Mosley's burden to prove that she did not utilize that relationship to take unfair advantage of Penn. Further, Penn argued that "the magistrate put the burden on Mr. Penn to prove that Ms. Mosley had taken the router, his business supplies, his file cabinet with all of his business files, receipts, his passport, birth certificate, social security card and other personal documents." Penn then referenced his testimony that these items were in his home when he went to the hospital and were missing when he returned the next day. Penn further cited the testimony of both Mosley and Stridiron that they were unsupervised when she removed her belongings from the residence that night while Penn was at the hospital. Thus, Penn claimed that "[t]he only reasonable conclusion is that whatever was missing was taken by Ms. Mosley."

The Appellate Division upheld the Magistrate Division holding that there was no evidence in the record to support a finding that Mosley exercised undue influence or undertook any actions in order to gain an

---

[2] As an alternative, the Appellate Division found that Mosley's past services rendered constituted adequate consideration for the written contract. The Appellate Division further found that the Magistrate Division had an adequate factual basis upon which it could have concluded Penn's signature on the document to be authentic.

unfair advantage of Penn.[3] Further, the Appellate Division found that Penn had not sustained his burden of proof to establish that Mosley took the personal property for which Penn counterclaimed.

## II. JURISDICTION

 This Court has jurisdiction over all appeals arising from any final judgment, decree, or order of the Superior Court. 48 U.S.C. § 1613a(d); V.I. CODE ANN. tit. 4, § 32(a); *Coastal Air Transp. v. Royer*, 64 V.I. 645, 650 (V.I. 2016).[4] A final judgment, decree, or order ends the litigation on the merits, leaving nothing else for the court to do except execute the judgment. *Ramirez v. People*, 56 V.I. 409, 416 (V.I. 2012). The entry of a final judgment, order, or decree implicitly denies all pending motions. *Simpson v. Bd. of Directors of Sapphire Bay Condo. W.*, 62 V.I. 728, 731 (V.I. 2015). An order from the Appellate Division affirming a final judgment, order, or decree of the Magistrate Division is a final order from which an appeal lies. *Moore v. Walters*, 61 V.I. 502, 506 (V.I. 2014); *Lehtonen v. Payne*, 57 V.I. 308, 312 (V.I. 2012). The final order from which Penn appeals was entered September 8, 2016, and the notice of appeal was filed October 6, 2016. Therefore, this Court has jurisdiction to hear this timely appeal. V.I. R. APP. P. 5(a)(1); *see Billu v. People*, 57 V.I. 455, 460 n.3 (V.I. 2012) (noting that, where an amended rule utilized the same language as the rule in effect at the time the notice of appeal was filed, the amended rule is applied); *cf. Webster v. FirstBank Puerto Rico*, 66 V.I. 514, 519 n.3 (2017) (applying former rules of the Superior Court in effect at the time the judgment was entered); *Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 548 n.13 (V.I. 2015) (applying version of statute in effect at the time the action was commenced).

---

[3] The Appellate Division's primary reasoning for rejecting this argument was that it was not presented in the Magistrate Division and was thus waived.

[4] A decree was "traditionally, a judicial decision in a court of equity, admiralty, divorce, or probate — similar to a judgment of a court of law." BLACK'S LAW DICTIONARY 180 (2d pocket ed. 2001). A judgment is "A court's final determination of the rights and obligations of the parties in a case. The term judgment includes a decree and any order from which an appeal lies." *Id.* at 378. An order is "a written direction or command delivered by a court or a judge." *Id.* at 505; *see generally, e.g., Etienne v. Etienne*, 56 V.I. 686, 690-91 (V.I. 2012) (citing *Rojas v. Two/Morrow Ideas Enters., Inc.*, 53 V.I. 684, 691 (V.I. 2010); *V.I. Gov't Hosps. & Health Facilities Corp. v. Gov't of the V.I.*, 50 V.I. 276, 279 (V.I. 2008)) (finding that a Superior Court Divorce Decree is a final judgment); *Demming v. Demming*, 66 V.I. 502, 506-507 (V.I. 2017) (citing *Garcia v. Garcia*, 59 V.I. 758, 766 (V.I. 2013); *Bradford v. Cramer*, 54 V.I. 669, 671 (V.I. 2011)) (same).

## III. STANDARD OF REVIEW

Penn propounds four issues for consideration. Penn first argues that the Appellate Division uncritically accepted the Magistrate Division's findings of fact, thus committing reversible error. Penn then argues that the Appellate Division erred when it declined to address Penn's claim that the signature on the document was forged. Penn also asserts that the Appellate Division unduly limited his claim of undue influence and applied the incorrect standard when it analyzed this claim. Finally, Penn argues that the Appellate Division erred when it found he had failed to present sufficient evidence to substantiate his counterclaim by a preponderance of the evidence.

■ ■ The standard of review for this Court's examination of the trial court's application of the law is plenary, and its findings of fact are reviewed for clear error. *Rodriguez v. Bureau of Corr.*, 58 V.I. 367, 371 (V.I. 2013), *overruled in part on other grounds by Mosby v. Mullgrav*, 65 V.I. 261, 268 (V.I. 2016); *Blyden v. People*, 53 V.I. 637, 646 (V.I. 2010). Findings of fact will be upheld unless they are either completely devoid of minimum evidentiary support displaying "some hue of credibility" or bear no rational relationship to the supportive evidence. *Moore*, 61 V.I. at 507. This Court considers the rulings of the Magistrate Division only to the extent they were adopted or affirmed by the Appellate division. *Id.* We remain mindful that the Magistrate Division is directed to do substantial justice by the parties in a Small Claims proceeding. *Cape Air Int'l v. Lindsey*, 53 V.I. 604, 612 (V.I. 2010).

## IV. DISCUSSION

### A. Because There is Evidence in the Record Supporting the Factual Findings of the Magistrate Division, the Appellate Division's Judgment Affirming the Ruling of the Magistrate Division is Correct.

While Penn asserts that the Appellate division failed to conduct "a thorough review of the record" and instead "simply [recited] the Magistrate's findings," his actual argument is substantively that "the only unambiguous evidence [that Penn's and Mosley's relationship was 'strictly business'] was [Mosley's] repeated statement that it was so." Penn further argues that the Appellate Division erred because "there was

no discussion or analysis of why other evidence which contradicted this finding was either not credible or carried little weight."

■ Having reviewed the Appellate Division's order, Penn's assertion that the judge did nothing more than recite the magistrate's findings of fact is absolutely fallacious. The order affirming the magistrate's ruling references various portions of the record where the evidence was produced and uses these facts to determine whether the magistrate's judgment was appropriate. In particular, the Appellate Division noted that the magistrate's findings of fact established that an oral contract between Penn and Mosley was formed prior to Mosley's return to St. Thomas, thus establishing that the January 9, 2015 agreement was a written memorial of the terms of the prior oral contract. The written agreement's terms provide documentary evidence that corroborates Mosley's testimony. None of the findings of the Magistrate Division, as affirmed by the Appellate Division, could be said to be "devoid of minimum evidentiary support displaying some hue of credibility" or to have "no rational relationship to the supportive [evidence]." *Moore*, 61 V.I. at 507 (internal quotation marks omitted).

Further, the Appellate Division repeatedly refers to the clearly erroneous standard of review for determinations of credibility in response to arguments raised by Penn. This reference is an explicit indication that the Appellate Division considered Penn's alternative testimony and recognized that the magistrate chose one of two versions of the competing testimonies. Thus, the Appellate Division was bound by that determination absent a showing that it was clearly erroneous.

■ In *Rivera v. People*, 64 V.I. 540, 554 (V.I. 2016), this Court, while articulating a standard of review for reversing a criminal conviction due to testimony that was so lacking in credibility as to be insufficient to sustain the conviction, outlined a number of factors that are relevant to attacking the credibility of testimony on appeal — in civil legal parlance, a determination of whether the evidence had "some hue of credibility." *Moore*, 61 V.I. at 507. In this assessment, factors to be considered are whether it was physically impossible for the witness to have observed that to which the witness testified; whether, considering the laws of nature, it was impossible for the events to which the witness testified to have happened; and, as applicable to this appeal, whether the testimony is of incredible dubiousness. *Rivera*, 64 V.I. at 554-56. To be "incredibly dubious," testimony must be inherently improbable with a complete lack

of circumstantial evidence or be coerced, equivocal, and wholly uncorroborated. *Id.* at 555.

■ No such infirmity exists in the evidence in this record. Mosley was consistent with her testimony and provided reasonable explanations for her conduct. Further, much of her testimony was corroborated by other witnesses' testimony. Stridiron confirmed that he and Mosley did business together, providing Mosley with income, which would have enabled her to reimburse Penn for the blender and freezer. Further, Stridiron testified that Penn's bed was in the bedroom and Mosley's the living room, suggesting that Penn and Mosley's relationship was not intimate. C. Penn testified that Penn, her brother, introduced Mosley as his "friend," and that, upon that meeting, Mosley proposed providing her with services, further corroborating Mosley's testimony that she and Penn were in a business relationship and not in an intimate relationship. Officer John also testified that Penn and Mosley were "roommates," as that was what he learned when he responded to a disturbance at their residence. He further confirmed that he had told Mosley to remove her belongings from Penn's home while Penn was at the hospital and confirmed Mosley's testimony that she had turned over Penn's keys. Mosley also provided documentary evidence supporting her testimony, such as proof of her payments reimbursing Penn, which bore appropriate dates thus providing circumstantial corroboration of Mosley's testimony.

Moreover, Penn corroborated much of Mosley's testimony himself. Penn confirmed that he and Mosley met via social media long before she arrived at St. Thomas. He confirmed that Mosley assisted him in developing his business website and that he agreed to let her live in his home if she helped pay the household expenses. He further admitted that he paid her at least $1,000 toward developing logos, labels, and other things for his family's business. Penn likewise conceded that Mosley did the majority of the paperwork and other administrative matters for the business. Beyond this, Penn also admitted Mosley had provided a business proposal regarding his family's business in December of 2012. During cross-examination, Penn further admitted that he and Mosley "may have" had a verbal agreement prior to her arriving at St. Thomas. Finally, Penn admitted that he and Mosley had started a business venture selling lighters online prior to Mosley returning to St. Thomas. Each of these admissions by Penn supports the factual findings of the magistrate.

■ The lack of explanation by the Appellate Division's as to why Penn's evidence was "not credible or carried little weight" was not an error because it was not the obligation of the Appellate Division to do so. The Appellate Division's obligation was to consider the evidence and affirm the Magistrate Division unless that ruling was "devoid of minimum evidentiary support displaying some hue of credibility" or had "no rational relationship to the supportive [evidence]." *Moore*, 61 V.I. at 507 (internal quotation mark omitted). As demonstrated by the Appellate Division's analysis, the ruling was rationally related to the supporting evidence. *See Tot v. United States*, 319 U.S. 463, 466-67, 63 S. Ct. 1241, 87 L. Ed. 1519 (1943). Moreover, the Appellate Division repeatedly noted where a credibility determination was made and declined to disturb that determination in deference to the Magistrate Division. Absent some evidence advanced by Penn that demonstrated some set of facts that made Mosley's testimony incredible — something Penn has failed to do — the Appellate Division did not commit error when it affirmed the ruling.

## B. The Appellate Division Did Not Commit Error by Holding That Penn Waived His Claim of Forgery.

■■ It is true that the Appellate Division noted that Penn's forgery claim was "raised for the first time on appeal and [was] waived."[5] However, the court reasoned in the alternative and provided another

---

[5] Penn raises an issue of note in his argument. Small Claims matters prohibit representation by an attorney, 4 V.I.C. § 112(d), and the proceedings are summary and informal only requiring that substantial justice is done, 4 V.I.C. § 111, without being bound by the statutory provisions and rules of practice, procedure, pleading, or evidence. V.I. SUPER. CT. R. 64 (2016) ("The judge shall conduct the trial in such a manner as to do substantial justice between the parties according to the rules of substantive law, and shall not be bound by the statutory provisions or rules of practice, procedure, pleadings, or evidence . . . ."); V.I. SUPER. CT. R. 62(c) (2016) ("All pleadings shall be so construed as to do substantial justice."); V.I. SUPER. CT. R. 63(c) (2016) ("If both parties fail to appear, the judge may order the case dismissed for want of prosecution, or make any other just and proper disposition thereof, as justice may require."); *cf.* V.I. SUPER. CT. R. 69 (2017) ("The Virgin Islands Rules of Civil Procedure shall apply to the small claims division to the extent not inconsistent with the foregoing rules."). It certainly raises Due Process concerns that the Appellate Division so readily deemed Penn to have waived this argument by not presenting it in the Magistrate Division. *See generally Marsh-Monsanto v. Clarenbach*, 66 V.I. 366, 392-395 (V.I. 2017) (Swan, J., dissenting) (discussing procedural precautions necessary to preserve the Due Process rights of *pro se* litigants). The Appellate Division should be cautioned to look at the factual substance of what was raised by Penn in the Magistrate Division, *Bryan v. Fawkes*, 61 V.I. 416, 467 n.30 (V.I. 2014) (citing *Anthony v. FirstBank V.I.*, 58 V.I. 224, 228 n.5 (V.I.

895

rationale for upholding the magistrate's rulings. The Appellate Division cited several facts in the record. First, Penn only asserted a lack of memory of signing the document and phrased his attack on its authenticity in the hypothetical language that "he wouldn't have signed" the agreement. This is infinitely different from testimony unequivocally

---

2013); *Island Tile & Marble, LLC v. Bertrand*, 57 V.I. 596, 611-12 (V.I. 2012)); *see Jarbough v. Att'y Gen.*, 483 F.3d 184, 189 (3d Cir. 2007); *e.g., Cape Air Int'l*, 53 V.I. at 616 ("Before addressing whether the evidence established a prima facie case for relief, it is necessary to ascertain the cause of action that provided the basis for [the claim made in the Small Claims matter]."), rather than the legal terminology used by his lawyer when seeking review in the Superior Court's Appellate Division. Penn testified that he did not remember signing the document and that he would not have signed such a document due to the timing of when it was signed and the disagreements he and Mosley had had directly before that date. Penn asserts this raised the forgery argument. While we need not determine this question since our ruling above moots this issue, the Appellate Division is cautioned to look at the factual substance of the testimony of *pro se* Small Claims parties and consider legal theories that might be implicated in determining if an issue was fairly presented in a Small Claims matter. *E.g., id.* at 619 ("While an airline's liability for missing luggage would typically be governed by the carrier's contract of carriage, in the absence of proof that Cape Air's Contract of Carriage Applied to Mr. Lindsey's travel with the carrier, we will rely on an implied bailment agreement[.]").

In this case, the Appellate Division provided absolutely no analysis to support its conclusion that this issue was not presented through Penn's factual testimony. The failure to provide such analysis was reversible error. *Henry v. Dennery*, S. Ct. Civ. No. 2012-0130, 2013 V.I. Supreme LEXIS 4, at *7 (V.I. Jan. 11, 2013) (unpublished) ("[T]he fleeting language in the October 26, 2012 Opinion that the Appellate Division would have reached the same result even if it followed the Rule 322 procedure is immaterial, since the Appellate Division simply states that it would have affirmed the December 17, 2009 Judgment based on the Magistrate Division record without providing any sort of explanation for its decision."); *see* V.I. SUPER. CT. R. 322.3(c) ("Hearings are deemed helpful where: . . . clarification of issues or facts are required given the state of the case record[.]"); *see also* V.I. SUPER.CT. R. 322.1(i)(A), (E)(v) (allowing the judge to set a briefing schedule and requiring briefs to present reasons supporting their challenge on appeal); *cf. In re Q.G.*, 60 V.I. 654, 660 (V.I. 2014) ("Duane first argues that the Superior Court erred in summarily denying his motion to intervene without explanation. We agree."); *Gerace v. Bentley*, 65 V.I. 289, 297 (V.I. 2016) ("This failure to address an argument — even on a question of law to which this Court owes the Superior Court no deference — itself constitutes grounds for reversal." (citing *Gov't of the V.I. v. Connor*, 60 V.I. 597, 604 (V.I. 2014))); *Anthony v. Indep. Ins. Advisors, Inc.*, 56 V.I. 516 (V.I. 2012) ("[W]hile 'the grant or denial of an opportunity to amend is within the discretion of the [trial court],' the 'outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion[.]' " (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962))); *Dowdye v. People*, 55 V.I. 736, 771 (V.I. 2011) ("[A] trial court violates the abuse of discretion standard when it acts prior to 'reach[ing] the point of exercising [its] discretion[.]' " (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 559, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) (Brennan and Marshall, JJ., concurring))).

stating that one did not sign a document. Further, the Appellate Division cited Mosley's testimony as to the timing of the execution of the writing and the reasons she wanted their prior oral agreement memorialized in writing. Finally, the Appellate Division cited Penn's own testimony that the signature on the document "surely looked like" his signature. Again, this is too insubstantial to support an assertion that a signature is forged. Considering these pivotal findings, the Appellate Division found that there was sufficient evidence to support the judgment of the Magistrate Division. Accordingly, no error was committed.

## C. Because the Signed Agreement was Only the Memorial of a Prior Oral Contract, the Appellate Division did Not Commit Error in Affirming the Ruling of the Magistrate Division.

 This Court has recognized that a ruling may be affirmed on appeal if we reach the same result but apply a different rationale. *Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 406 (V.I. 2016) ("For the reasons that follow, we affirm, albeit on different grounds than those articulated by the Superior Court."). The Appellate Division concluded that the magistrate "made factual findings that would support a determination that the parties had an oral or implied-in-fact contract." The facts cited by the Appellate Division readily support this conclusion. Penn and Mosley formed this contract via the internet and phone conversations before Mosley returned to the Virgin Islands, but Penn argues to this Court that "the subject of the overreaching would be the signed contract on which the Magistrate stated that she principally relied." Considering the above, the concerns of the confidential relationship addressed in *Ross*, 58 V.I. at 303-04, and so forcefully argued by Penn are not implicated in this case.

 The rule announced in *Ross*, 58 V.I. at 304, was that the existence of a confidential relationship gives rise to a presumption of undue influence when there is **a transaction** between the parties to the confidential relationship. The party benefiting from "**the transaction**" must then prove by clear and convincing evidence the absence of undue influence in effecting the transaction. *Id.* The Superior Court's failure to examine this cause of action and to articulate enumerated elements creates confusion, but it is clear that a requisite element of an undue influence claim is "**the transaction(s)**" being challenged.

 However, by the Appellate Division's analysis, the transaction challenged here, the January 9, 2015 memorialization of Penn and

Mosley's oral agreement, is legally irrelevant to the success of Mosley's claim. Mosley claimed that Penn orally promised her several things in lieu of cash compensation for her work, and the Appellate Division found that Mosley's actions of performing the agreed upon work were an effective acceptance creating an oral contract. (J.A. at 8 ("Irrespective of the written contract, the Magistrate also made factual findings that would support a determination that the parties had an oral or implied-in-fact contract.").) Whatever may have transpired on January 9, 2015 was irrelevant to whether Penn had created a legal obligation prior to Mosley's returning to the Virgin Islands many months prior. Therefore, the Appellate Division's ruling affirming the Magistrate Division is affirmed.[6]

### D. The Magistrate Division did Not Err When it Determined that Penn had Failed to Prove his Counterclaim for Conversion by a Preponderance of the Evidence.[7]

 While Penn's counsel failed, both in this Court and the Appellate Division, to articulate Penn's claim in terms of "conversion,"[8] courts should examine, not just the nominal label (or, as here, the absence

---

[6] Again, the Appellate Division found this argument to not have been fairly presented in the Magistrate Division. As discussed in the prior footnote, in Small Claims matters, such a reflexive and mechanistic determination of this issue is inappropriate. The Appellate Division should consider the legal import of the facts presented in the Magistrate Division in light of the legal arguments presented on appeal, *Bryan*, 61 V.I. at 467 n.30; *see Jarbough*, 483 F.3d at 189 (directing trial courts to look to the substance of what is asserted), to see if the facts as presented could reasonably be understood to raise the issue presented on review. Failing this, resort to a hearing pursuant to Rule 322.3(c) of the Superior Court should be had.

[7] This Court has not adopted the cause of action of conversion pursuant to a Banks Analysis, and the Appellate Division's failure to do so was reversible error. *Connor*, 60 V.I. at 604. Because Penn's failure to establish that Mosley was the party responsible for any missing chattels disposes of this issue and would be a required element of any claim of conversion as a matter of a defendant's Due Process rights, *see Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 191, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2009) (stating that in every case it must be proved that the defendant acted); *cf. Ross*, 58 V.I. at 308 (noting without a Banks Analysis that there must be an "actor" who exercised dominion and control over the chattel), we will limit our analysis to that specific element and leave it to the Superior Court to conduct a full Banks Analysis when the issue is presented in the first instance.

[8] " 'Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.' " *Ross*, 58 V.I. at 308 (quoting RESTATEMENT (SECOND) OF TORTS § 222A(1) (1965)).

of a label), but the substance of what is requested. *Jarbough v. Att'y Gen.*, 483 F.3d 184, 189 (3d Cir. 2007). Penn unequivocally argued that property, which was his, had been removed from his home by Mosley and not returned. This is the archetypical example of conversion.

Penn's argument to this Court is that the circumstantial evidence he presented was adequate to prove that Mosley intentionally exercised dominion and control over the missing chattels by removing them from his home.[9] The pivotal question presented by Penn is this: As a matter of law, do the facts that 1) Mosley had authorized access to Penn's home for 24 to 48 hours while he did not, 2) Mosley was, in fact, in the home during that time, and 3) the chattels were not present in the home when Penn returned after 24-48 hours provide circumstantial evidence so convincing as to make clearly erroneous the factual determination of the magistrate that Penn failed to prove that Mosley took the subject chattels?

█ In the Superior Court, the proponent of a claim must prove the affirmative of an issue by a preponderance of the evidence. 5 V.I.C. § 740(5); *Rennie*, 62 V.I. at 544. While direct proof of a person's actions is not necessary to prove the affirmative, the fact finder may only infer such from circumstantial evidence when reason and experience support such an inference because there is a rational connection between the facts proved and the facts inferred. *See Tot*, 319 U.S. at 466-67.

█ The facts Penn claims to affirmatively establish that Mosley removed the missing items are that Mosley was present in his home while he was absent and the items were removed. Further supporting the inference is the fact that this directly followed a situation in which Mosley and Penn were in conflict. One cannot reasonably conclude, even by the lower preponderance of the evidence standard, that Mosley's permitted presence in Penn's home is causal of the loss of the property Penn found missing 24-48 hours later. There is too long a hiatus in time between Mosley's presence in Penn's home and Penn's discovery of the missing items to allow a reasonable inference that Mosley was responsible for their loss; Penn's evidence plainly did not affirmatively prove Mosley removed his personal property. *See Cape Air Int'l*, 53 V.I. at 621 ("Under

---

[9] There is no question as to damages. Penn testified that he previously owned the goods and that they had not been returned as of the time of trial. Assuming Penn established the other elements, he was clearly damaged by the loss of any property to the extent of the value of the property. *See generally* BLACK'S LAW DICTIONARY 416 (8th ed. 2004).

these circumstances, the Superior Court erred in rendering judgment in favor of the [counterclaimants]. [They] failed to present sufficient evidence to support their claim . . . , and to hold [the counter-defendant] liable merely because the evidence showed the jewelry was missing would render the airline an insurer of the goods."); *cf. Gov't of the V.I. v. Blake*, 12 V.I. 406, 407 (V.I. Super. Ct. 1975) (excluding an item of evidence as unreliable due to chain of custody violations where the government failed to prove "possession and control" of the item of evidence by the investigating officer when he left the evidence at his home while he was off island for several days).

In *Cape Air International*, the relevant facts were undisputed. 53 V.I. at 621. The airline had delivered the claimant's luggage to the promised location, but the claimant failed to retrieve it in a timely manner. *Id.* When the claimant retrieved the luggage the next day, jewelry that had been inside the luggage was missing. *Id.* In holding this inadequate to establish that any actions or failure to act by the airline caused the loss of the jewelry, this Court identified further evidence that would have supported such a claim. *Id.* We noted that "the evidence is silent as to who removed the bag from the baggage belt the night before, who had access to it during the overnight hours, who placed it behind the counter, whether the counter was an area controlled by Cape Air, and whether the woman who met Mr. Lindsey in the morning was a Cape Air representative." *Id.*

Similarly, Penn failed to present evidence corroborating any of the claimed items were ever in his home, let alone any evidence corroborating that the items were missing. It is difficult to believe that Penn could not produce a single witness who had been to his residence sufficient times to have observed some of the items there prior to Mosley's departure and saw them missing after that time. Further, Penn failed to present evidence indicating that the items were missing without any indication of breaking or entering. Penn further failed to eliminate as the possible actor any others who may have had keys to his apartment. Given the passage of time and the lack of other evidence indicating the items were missing due to some action or inaction by Mosley, Penn's assertion that Mosley took the property "is pure speculation." *Cape Air Int'l*, 53 V.I. at 621 (quoting *In re Nantucket Aircraft Maint. Co.*, 54 B.R. 86, 88 (Bankr. D. Mass. 1985)).

 Further, Penn did not diligently examine two witnesses as to what items they observed when Mosley removed her belongings from Penn's

residence. *See* 5 V.I.C. § 740(6) ("Evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and, therefore, if the weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory evidence was within the power of the party, the evidence offered should be viewed with distrust."). Stridiron admitted to being present when Mosley removed her belongings from Penn's home. Yet, Penn did not attempt to inquire whether Stridiron observed Mosley remove Penn's file cabinet or any of the papers inside the cabinet or any of the other missing items. Likewise, Officer John admitted to having seen the loaded vehicle Mosley used to transport her possessions from Penn's home. Yet, Penn failed to examine this witness regarding what the officer saw being transported. While both witnesses equivocated as to their memories and observations, Penn certainly could have gone through each of the missing items specifically to ascertain if mention of any one of them would have refreshed their memories. While *pro se* litigants are afforded great leeway, *Simpson v. Golden*, 56 V.I. 272, 280 (V.I. 2010), the factual test of whether an inference is permissible is one of every day experience — whether "reason and experience" support the inference. *Tot*, 319 U.S. at 467. Penn's failure to tease out such testimony cannot be disregarded as a misstep of a *pro se* litigant unfamiliar with the technical procedures of court. Instead, this is the failure of a *pro se* litigant to even question a witness about a matter that is within the reason and experience of lay witnesses. Such actions are a failure of proof. *See generally cf. Marsh-Monsanto*, 66 V.I. at 394 (Swan, J., dissenting) (discussing the accommodations necessary for *pro se* litigants "in a complex case" where one who "is not trained to explore multiple [legal] theories of a case" will not be able to adequately represent herself).

In great contrast to Penn's alleged affirmative evidence, Mosley admitted to taking certain items and presented documentary evidence corroborating her testimony. She offered an explanation concerning why she removed her possessions while Penn was not home, and the police officer who instructed her to take these actions confirmed the occurrence. Penn argued that she had taken a set of keys, but Mosley verified that she had given her set to the police officer and that Penn's set of keys had been on the floor of the apartment when she vacated it. Penn testified that there was possibly a third set of keys to his home, but this testimony was, at

best, confusing — the magistrate judge's credibility determination was not clearly erroneous. *Cf.* 5 V.I.C. § 740(3) ("A witness willfully false in one part of his testimony may be distrusted in others.").

## V. CONCLUSION

The Appellate Division demonstrated in its memorandum opinion that it had reviewed the record critically and applied the appropriate standards of review; therefore, we agree with the Appellate Division's affirmance of the Magistrate Division's judgment. The Appellate Division fully considered Penn's claim of forgery, and its decision was supported by the record; therefore, the Appellate Division did not commit error in affirming the Magistrate Division's judgment. Because Penn and Mosley had an oral contract for her services prior to the establishment of any confidential relationship, there was no predicate transaction in which Mosley could have used her confidential relationship to take unfair advantage of Penn, and the Appellate Division's affirmance of the Magistrate Division's judgment was not error. Finally, the circumstantial evidence upon which Penn relies to prove the causal link between Mosley and his missing personal property is too tenuous to support a finding by the preponderance of the evidence that Mosley took the property. The order of the Appellate Division is affirmed.